**COASTAL FUELS OF PUERTO RICO, INC., Plaintiff—Appellee,**

v.

**CARIBBEAN PETROLEUM CORPORATION, Defendant—Appellant.**

No. 95–1460.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1995.

Decided March 12, 1996.

William L. Patton, with whom Thomas B. Smith, Kenneth A. Galton, Ropes & Gray, Boston, MA, Rubén T. Nigaglioni and Ledesma, Palou & Miranda, Hato Rey, PR, were on brief for appellant.

Michael S. Yauch, with whom Neil O. Bowman, Roberto Boneta, Houston, TX, and Muñoz Boneta González Arbona Benítez & Peral, Hato Rey, PR, were on brief for appellee.

* Of the United States Court of International Trade.

Before TORRUELLA, Chief Judge, WATSON,* Senior Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

This appeal involves claims of price discrimination, 15 U.S.C. § 13(a) (1994); 10 L.P.R.A. § 263 (1976), monopolization, 15 U.S.C. § 2 (1994); 10 L.P.R.A. § 260 (1976), and Puerto Rico law tort, 31 L.P.R.A. § 5141 (1976), brought against appellant Caribbean Petroleum Corp. by appellee Coastal Fuels of Puerto Rico, Inc. After a jury trial, the district court entered judgment for $5,000,000—$1.5 million in antitrust damages trebled plus $500,000 in tort damages. CAPECO seeks that the judgment of the district court be reversed and judgment be granted to CAPECO on all counts, or alternatively, that the judgment be reversed and the case remanded for a new trial. We affirm the price discrimination and Puerto Rico law tort verdicts, as well as the tort damage verdict. However, we reverse the monopolization verdict, vacate the antitrust damages verdict, and accordingly remand for further proceedings on price discrimination damages.

## BACKGROUND

We relate the evidentiary background in the light most favorable to the jury verdicts. See Kerr–Selgas v. American Airlines, Inc., 69 F.3d 1205, 1206 (1st Cir.1995).

Coastal Fuels of Puerto Rico, Inc. ("Coastal") was formed in 1989 as a wholly-owned subsidiary of Coastal Fuels Marketing, Inc. ("CFMI"), a company that ran marine fuel operations in numerous ports using a staff of sales agents in Miami, Florida. Caribbean Petroleum Corp. ("CAPECO") owns and operates a refinery in Bayamón, Puerto Rico, which produces a number of fuel products, as well as residual fuel. A principal use of residual fuel is in the production of "bunker fuel," which is used by cruise ships and other ocean-going vessels outfitted with internal combustion or steam engines.

At trial, Coastal introduced testimony and letters showing that CAPECO had commit-

ted to supply Coastal on the same terms and conditions as other resellers in San Juan, Puerto Rico, in 1990, but Coastal deferred the start of its operations because of uncertainty due to the Gulf War. Eventually, Coastal began business operations in Puerto Rico in October 1991, buying bunker fuel in San Juan and reselling it to ocean-going liners at berth in San Juan Harbor. Based on CFMI's experience and reputation, Coastal produced a business plan which shows that it expected to reach a sales volume of 100,000 barrels a month, approximately 25–30% of the sales volume in San Juan Harbor. The plan also shows that Coastal assumed it could obtain an average gross margin (sales revenues less product costs) of $1.65 a barrel.

In September 1991, CAPECO agreed to charge Coastal prices based on a formula involving the previous Thursday/Friday New York market postings, minus discounts that varied by volume. These prices were to cover the six month period from October 1991 to March 1992. Unknown to Coastal, CAPECO was almost simultaneously offering Coastal's two competitors in San Juan Harbor, Caribbean Fuel Oil Trading, Inc. ("Caribbean") and Harbor Fuel Services, Inc. ("Harbor"), new contracts that gave Caribbean and Harbor bigger discounts from the formula price than Coastal received.[1] Trial evidence introduced by CAPECO's own expert witness quantified the total price discrimination in favor of Caribbean and Harbor as $682,451.78 for the period from October 1991 to April 1992.

Coastal filed this suit in May of 1992 when it learned of CAPECO's price discrimination against it. This court affirmed the district court's denial of a preliminary injunction requiring that CAPECO end its price discrimination. See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 990 F.2d 25, 26 (1st Cir.1993). After Coastal filed suit, CAPECO proposed a new price formula to

Coastal. According to trial testimony introduced by Coastal, CAPECO basically made a "take it or leave it" offer, which Coastal took. Expert testimony Coastal offered at trial contended that competitively significant price discrimination continued until Spring of 1993, when CAPECO cut Coastal off entirely.

Additionally, Coastal presented evidence that, while throughout this period CAPECO would from time to time inform Coastal that it had no fuel available, in fact, CAPECO had available fuel. Coastal also presented evidence that it was discriminated against in terms of the quality of fuel that it received from CAPECO. Finally, on March 31, 1993, CAPECO informed Coastal in writing that it would not sell any more product to Coastal, and shortly thereafter, Coastal went out of business.

The case was tried to a jury on claims (1) that CAPECO discriminated in price in violation of Section 2(a) of the Clayton Act, 38 Stat. 730 (1914) (current version at 15 U.S.C. § 13(a)), as amended by the Robinson–Patman Act, 49 Stat. 1526 (1936), and in violation of Section 263(a) of Title 10 of the Laws of Puerto Rico; (2) that CAPECO monopolized trade or commerce in violation of Section 2 of the Sherman Act and Section 260 of Title 10 of the Laws of Puerto Rico; (3) that CAPECO violated Section 5141 of Title 31 of the Puerto Rico Civil Code by engaging in tortious conduct that injured Coastal; and (4) that CAPECO committed a breach of contract in violation of Sections 3371 et seq. of Title 31 of the Puerto Rico Civil Code. As reflected in the jury's answers to the Special Interrogatories, the jury found for Coastal on the first three of these claims, but found for CAPECO on the breach of contract claim. The jury awarded damages of $1,500,000 for the antitrust violations combined and $500,000 for the Puerto Rico tort violation. The antitrust damages were trebled, see 15 U.S.C. § 15(a), bringing the total award to $5,000,000.

---

1. CAPECO tried to argue below and again argues here, that the contracts it executed with Caribbean and Harbor were qualitatively different in their non-price terms and conditions from CAPECO's arrangement with Coastal, justifying the discounts. Coastal responds that it was never offered the terms and conditions that Caribbean and Harbor received. In light of the jury's verdict for Coastal on the price discrimination claim, from conflicting evidence such as this, we draw the (reasonable) conclusion in Coastal's favor.

## DISCUSSION

CAPECO argues for a reversal of the district court's judgment, or alternatively, for a new trial. We address the arguments for reversal first.

### I. Arguments for Reversal

The first set of issues involves the district court's denial of CAPECO's motions for judgment as a matter of law under Fed. R.Civ.P. 50. With respect to matters of law, our review is *de novo*. *Sandy River Nursing Care v. Aetna Casualty*, 985 F.2d 1138, 1141 (1st Cir.1993).

Seeking judgment as a matter of law, CAPECO has raised a set of issues on appeal that concern the application of federal and Puerto Rico law on price discrimination and monopoly, as well as Puerto Rico tort law, to the facts of this case. With respect to these issues, we review the court's decision *de novo*, using the same stringent decisional standards that controlled the district court. *See Sullivan v. National Football League*, 34 F.3d 1091, 1096 (1st Cir.1994); *Gallagher v. Wilton Enterprises, Inc.*, 962 F.2d 120, 125 (1st Cir.1992). Under these standards, judgment for CAPECO can only be ordered if the evidence, viewed in the light most favorable to Coastal, points so strongly and overwhelmingly in favor of CAPECO, that a reasonable jury could not have arrived at a verdict for Coastal. *See Sullivan*, 34 F.3d at 1096; *Gallagher*, 962 F.2d at 124–25.

### A. Price Discrimination

■ Section 2(a) of the Clayton Act, amended in 1936 by the Robinson–Patman Act, makes it

unlawful for any person ... to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. ...

15 U.S.C. § 13(a). A pair of sales at different prices makes out a *prima facie* case. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 444 n. 10, 103 S.Ct. 1282, 1293 n. 10, 75 L.Ed.2d 174 (1983); *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960) ("[A] price discrimination within the meaning of [the statute] is merely a price difference.").

■ Section 2(a) includes two offenses that differ substantially, but are covered by the same statutory language. A "primary-line" violation occurs where the discriminating seller's price discrimination adversely impacts competition with the seller's direct competitors. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219–21, 113 S.Ct. 2578, 2586, 125 L.Ed.2d 168, *reh'g denied*, —— U.S. ——, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993). *See generally* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 8.8 (1994). In contrast, a "secondary-line" violation occurs where the discriminating seller's price discrimination injures competition among his customers, that is, purchasers from the seller. *See, e.g., FTC v. Sun Oil Co.*, 371 U.S. 505, 519, 83 S.Ct. 358, 366, 9 L.Ed.2d 466 (1963); *Caribe BMW, Inc. v. Bayerische Motoren Werke, A.G.*, 19 F.3d 745, 748 (1st Cir.1994); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1535–38 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). *See generally* Hovenkamp § 14.6. The theory of injury is generally that the defendant's lower price sales to the plaintiff's competitor (the favored purchaser) placed the plaintiff at a competitive disadvantage and caused it to lose business. *Id.*

We address first CAPECO's contention that the district court erred in treating this case as one of secondary-line price discrimination rather than primary-line price discrimination. Specifically, CAPECO protests the district court's instruction to the jury that injury to competition among competing purchaser-resellers may be inferred from

proof of substantial price discrimination by a producer among competing purchaser-resellers, an inference appropriate to secondary-line discrimination. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 50–51, 68 S.Ct. 822, 830, 92 L.Ed. 1196 (1948). CAPECO argues that Coastal is affiliated with an organization that competes with CAPECO, and therefore this was a primary-line case; as a result, the *Morton Salt* inference would not apply.

We do not consider the argument that this is a primary-line case, because CAPECO has chosen to make this argument for the first time on appeal. While CAPECO did object to the *Morton Salt* instruction at the district court, that objection was directed at the use of the word "infer" couched in a generalized attack on the instruction as suggesting a presumption not borne out by case law.[2] We have noted before that "Rule 51[3] means what it says: the grounds for objection must be stated 'distinctly' after the charge to give the judge an opportunity to correct his [or her] error." *Linn v. Andover Newton Theological School, Inc.*, 874 F.2d 1, 5 (1st Cir. 1989); *see also Jordan v. United States Lines, Inc.*, 738 F.2d 48, 51 (1st Cir.1984). Leaving aside whether the district court in fact erred in making the questioned instruction, it seems clear that CAPECO did not set forth the argument it now advances when it objected to the instruction at issue. And if CAPECO did intend to express this argument, it neither advised the district court judge of this problem in a manner that would allow him to make a correction, nor informed him what a satisfactory cure would be. *Linn*, 874 F.2d at 5. Because the argument was thus not preserved, we will reverse or award a new trial only if the error "resulted in a miscarriage of justice or 'seriously affected the fairness, integrity or public repu-

tation of the judicial proceedings.' " *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 945 (1st Cir.1995) (quoting *Lash v. Cutts*, 943 F.2d 147, 152 (1st Cir.1991)). We fail to find such concerns of judicial propriety implicated here.[4]

As a result, we analyze this case as one of secondary-line discrimination. Thus, the theory of injury is that CAPECO sold bunker fuel to Coastal at an unfavorable price relative to Harbor and Caribbean, and consequently, competition between Coastal, Harbor and Caribbean was thereby injured. On appeal, CAPECO makes three arguments based on what it purports to be required elements for Coastal's price discrimination damages claim: first, that the sales in question were not "in commerce" and so section 2(a)'s prohibitions do not apply; second, that Coastal failed to make the requisite showing of competitive injury to prevail; and third, that Coastal failed to carry its burden of proving actual injury in order to be entitled to an award of money damages.

### 1. "In Commerce"

CAPECO argues, correctly we conclude, that section 2(a) of the Clayton Act does not apply because in the instant case, neither of the two transactions which evidence the alleged price discrimination crossed a state line. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200–201, 200 n. 17, 95 S.Ct. 392, 401, 401 n. 17, 42 L.Ed.2d 378 (1974). For a transaction to qualify, the product at issue must physically cross a state boundary in either the sale to the favored buyer or the sale to the buyer allegedly discriminated against. *See, e.g., Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 202 (6th Cir.1986); *Black Gold Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 683 (10th Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct.

---

**2.** We address this distinct argument below.

**3.** Fed.R.Civ.P. 51 states, in pertinent part, that

> [n]o party shall assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

**4.** While this court has admitted "occasional" exceptions to the "raise-or-waive" principle, *see National Assoc. of Social Workers v. Harwood*, 69 F.3d at 627–28, the concerns that justify an exception are not implicated here, *see id.*, 69 F.3d at 627–28 (finding exception given certain circumstances including the fact that failure to raise issue did not deprive court of appeals of useful factfinding, and the fact that the issue in question raises constitutional concerns).

178, 83 L.Ed.2d 113 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1043–44 (9th Cir. 1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *S & M Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980); *Rio Vista Oil, Ltd. v. Southland Corp.*, 667 F.Supp. 757, 763 (D.Utah 1987).

However, this issue is not dispositive, because the jury found that CAPECO violated the Puerto Rico price discrimination statute, which is identical to Section 2(a) except that it contains no interstate commerce requirement.[5] CAPECO has not challenged the district court's supplemental jurisdiction stemming from Coastal's Sherman Act claims. The relevant statute states that "in any civil action over which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy." 28 U.S.C. § 1367 (1994). In application, "[i]f, considered without regard to their federal or state character, a plaintiff's claims are such that [it] would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, (1966); *see Rodríguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1175–76 (1st Cir.1995) (interpreting and applying 28 U.S.C. § 1367). In the instant case, the price discrimination claims

flow out of the same set of facts and require the same evidence as the Sherman Act claims. Because we uphold the district court's jurisdiction over the Sherman Act claims, *see* 15 U.S.C. § 4 (1994) (investing "[t]he several district courts of the United States ... with jurisdiction to prevent and restrain violations of [Title 15] sections 1 to 7[,]" which includes the Sherman Act), we also must conclude that the district court properly exercised supplementary jurisdiction over the price discrimination claims.

▇▇▇ Thus, we conclude that the district court erred in applying section 2(a) of the Clayton Act to the conduct at issue, and accordingly reverse that part of its opinion. However, we find applicable section 263 of the Puerto Rico Anti–Monopoly Act, 10 L.P.R.A. § 263. Because section 263 was patterned after and is almost identical to section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, we look to the jurisprudence interpreting federal law as a guide in applying the statute.[6] Given that the one key difference between the federal and Puerto Rico statutes is the lack of an "in commerce" requirement in the Puerto Rico analogue, we conclude that we should interpret section 263 as intended to extend the provisions of section 2(a) of the Clayton Act to price discrimination within Puerto Rico, the situation which we confront in the instant case. Given the relative lack of applicable section 263 case law and the well-developed jurisprudence concerning Clayton Act section 2(a), we will focus on the latter in assessing the price discrimination claims.

---

**5.** The relevant language is as follows:

It shall be unlawful for any person, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where such commodities are sold for use, consumption, or resale in Puerto Rico, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce in Puerto Rico, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

10 L.P.R.A. 263 (1976). Furthermore, Puerto Rico law includes a counterpart for the section 4 of the Clayton Act's authorization of treble damages. *See* 10 L.P.R.A. 268 (1976).

**6.** *See Caribe BMW, Inc.*, 19 F.3d at 753 (1st Cir.1994) (interpreting "Puerto Rico's laws as essentially embodying the jurisprudence relevant to the parallel federal law," where antitrust plaintiff asserted claims under a Puerto Rico antitrust law that paralleled its federal antitrust law claim); *Whirlpool Corp. v. U.M.C.O. Int'l Corp.*, 748 F.Supp. 1557, 1565 n. 4 (S.D.Fla. 1990) (noting that "federal precedents construing the [Clayton Act, as amended by the] Robinson–Patman Act are applicable to the interpretation of Section 263" of the Puerto Rico Anti–Monopoly Act); *see also* Diario de Sesiones, 1964, Vol. 18, Part 4, pp. 1425–26, 1509, 1512, 1707–09; Arturo Estrella, *Antitrust Law in Puerto Rico*, 28 Rev.Jur. del Col.Ab.P.R. 615 (stating that interpretations of the Federal Robinson–Patman Act are to be looked to in construing section 263).

## 2. Injury to Competition

■ CAPECO's second argument in support of reversing the price discrimination portion of the judgment is that Coastal failed to demonstrate injury to competition. As noted above, we analyze this case as one of secondary-line price discrimination, and thus Coastal bears the burden of showing injury to competition between Coastal and its rival bunker fuel resellers, Harbor and Caribbean. Addressing the burden of the secondary-line plaintiff, the Supreme Court has stated that

[i]t would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a "reasonable possibility" that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers.

*Morton Salt Co.*, 334 U.S. at 50, 68 S.Ct. at 830. As a result, the Supreme Court has held that "for the purposes of section 2(a), injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls City*, 460 U.S. at 435, 103 S.Ct. at 1288 (citing *Morton Salt*, 334 U.S. at 46, 50–51, 68 S.Ct. at 828, 830); *see also Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559, 110 S.Ct. 2535, 2544, 110 L.Ed.2d 492 (1990); *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 528–529 (1st Cir.1989) (noting lower burden for antitrust plaintiff under Clayton Act, as amended by the Robinson–Patman Act, than under Sherman Act); *Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1139 (D.C.Cir.1988).

CAPECO challenges the district court's finding of competitive injury in two ways, arguing that the *Morton Salt* rule is no longer good law, or alternatively, that the *Morton Salt* rule was incorrectly applied in this case. We first address CAPECO's direct challenge to the vitality of the *Morton Salt* rule, a challenge based on the Supreme Court's opinion in *Brooke Group*, 509 U.S. 209, 113 S.Ct. 2578. In that case, the Supreme Court ruled that, because primary-line price discrimination injury is of the "same

general character" as predatory pricing schemes actionable under Sherman Act section 2, *Brooke Group*, 509 U.S. at 221–23, 113 S.Ct. at 2587, a primary-line injury plaintiff bears the same substantive burden as under the Sherman Act, that is, the plaintiff must show that the predator stands some chance of recouping his losses, *id.* 509 U.S. at 223–24, 113 S.Ct. at 2588. In so deciding, the Supreme Court implicitly overruled *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), in which the Supreme Court had set forth different standards for primary-line injury. *Brooke Group*, 509 U.S. at 221–23, 113 S.Ct. at 2587 (explaining that *Utah Pie* was merely an "early judicial inquiry").

According to CAPECO, the Supreme Court's recent emphasis in *Brooke Group* on reconciling the area of price discrimination with other antitrust law requires that we find that the *Morton Salt* rule no longer is good law. CAPECO notes that both primary-line and secondary-line price discrimination are prohibited by the same language of section 2(a) as amended by the Robinson–Patman Act. Furthermore, CAPECO contends that the Supreme Court in *Brooke Group* apparently undercut any reliance on a principled distinction between the aims of section 2 of the Clayton Act and other antitrust laws' purported emphasis on protecting "*competition, not competitors,*" *Brooke Group*, 509 U.S. at 224, 113 S.Ct. at 2588 (emphasis in original) (citation omitted); *see also Monahan's Marine, Inc.*, 866 F.2d at 528–29 (not discussing the *Morton Salt* rule, but noting that "unlike the Sherman Act, which protects '*competition* not *competitors*,' ... the [Robinson–Patman] Act protects *those who compete* with a favored seller, not just the overall competitive process." (emphasis in original)). Thus, according to CAPECO, precedent that pre-dates *Brooke Group* and applies the *Morton Salt* rule must be reexamined. *See, e.g.*, 496 U.S. at 544, 110 S.Ct. at 2537; *Falls City*, 460 U.S. at 436, 103 S.Ct. at 1289; *Boise Cascade v. FTC*, 837 F.2d 1127, 1153 (D.C.Cir.1988).

While CAPECO's argument has merit, we join the two other circuits that have addressed competitive injury in secondary-line

cases since *Brooke Group* in refusing to disregard the rule the Supreme Court formulated in *Morton Salt,* for three reasons.[7] First, the statutory structure that prohibits primary-line price discrimination "stands on an entirely different footing" than the statutory scheme that proscribes secondary-line discrimination. *See Rebel Oil Co.,* 51 F.3d at 1446. Congress first forbade primary-line price discrimination with the Clayton Act of 1914, which originally condemned discrimination that might "substantially ... lessen competition or tend to create a monopoly in any line of commerce." Clayton Antitrust Act, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. § 13(a) (1994)). The statute was intended to prevent large corporations from invading markets of small firms and charging predatory prices for the purpose of destroying marketwide competition, and thus specifically applied only to primary-line injury. *See* H.R.Rep. No. 627, 63rd Cong., 2d Sess. § 8 (1914); E. Thomas Sullivan & Jeffrey L. Harrison, *Understanding Antitrust and Its Economic Implications* § 8.03 (1988).

By contrast, secondary-line discrimination is forbidden by the Robinson–Patman Act, 49 Stat. 1526 (1936), 15 U.S.C. §§ 13–13b, 21a (1988), which amended the original Clayton Act's price discrimination proscriptions. Congress clearly intended the Robinson–Patman Act's provision to apply only to secondary-line cases, not to primary-line cases. *See* H.R.Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936),[8] *cited in Rebel Oil Co.,* 51 F.3d at 1446. In contrast to the Sherman Act and the Clayton Act, which were intended to proscribe only conduct that threatens consumer welfare, the Robinson–Patman Act's framers "intended to punish perceived economic evils not necessarily threatening to consumer welfare per se." *Rebel Oil Co.,* 51

F.3d at 1445. *See generally* Hovenkamp § 2.1a. In particular, the Robinson–Patman Act's amendments to the Clayton Act stemmed from dissatisfaction with the original Clayton Act's inability to prevent large retail chains from obtaining volume discounts from big suppliers, at the disadvantage of small retailers who competed with the chains. *See* S.Rep. No. 1502, 74th Cong., 2d Sess. § 4 (1936); H.R.Rep. No. 2287, 74th Cong., 2d Sess. §§ 3–4 (1936); *see also Morton Salt,* 334 U.S. at 49, 68 S.Ct. at 829 ("Congress intended to protect a merchant from competitive injury attributable to discriminatory prices"); *Rebel Oil Co.,* 51 F.3d 1421, 1446; *Monahan's Marine, Inc.,* 866 F.2d at 528–29.

Second, we are persuaded by the reasoning of the Ninth Circuit's opinion in *Rebel Oil Co.* that the amendment to the Clayton Act effected by the Robinson–Patman Act supports the continued vitality of the *Morton Salt* rule, even in the face of *Brooke Group*'s alteration of standards for primary-line price discrimination. While the Clayton Act only proscribed conduct that may "substantially lessen competition or tend to create a monopoly[,]" the new law added the following passage: "or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." *See Rebel Oil Co.,* 51 F.3d at 1447. The purpose of this passage was to relieve secondary-line plaintiffs—small retailers who are disfavored by discriminating suppliers—from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects on individual competitors. *See id.*; H.R.Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936). Such legislative intent directly supports maintaining

---

7. *See Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.,* 63 F.3d 1267, 1271 (3d Cir.1995) (applying *Morton Salt* rule without discussion of *Brooke Group* ); *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1446 (9th Cir. 1995) (noting in dicta that "in holding that a primary-line plaintiff must demonstrate an injury flowing from an aspect of the defendant's conduct injurious to consumer welfare, we intend in no way to affect the standard for antitrust injury in secondary-line cases"). *But see also Bob Nicholson Appliance, Inc. v. Maytag Co.,* 883 F.Supp. 321, 326 (S.D.Ind.1994) (holding that

"we are persuaded that the Seventh Circuit would extend the reasoning of *Brooke Group* and require actual injury to competition").

8. The Robinson–Patman Act "attaches to competitive relations between a given seller and his several customers. It concerns discrimination between customers of the same seller. It has nothing to do with ... requir[ing] the maintenance of any relationship in prices charged by a competing seller." H.R.Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936).

the *Morton Salt* rule, which puts into practice Congress' concern with placing the same burden on secondary-line plaintiffs that other antitrust plaintiffs face. Thus, the comparison that the Supreme Court drew between primary-line price discrimination and predatory pricing in *Brooke Group* stands on a different, and stronger, footing than any comparison that could be made between secondary-line price discrimination and other area of antitrust law, including, but not only, predatory pricing.

Third, and finally, the holding of the *Brooke Group* opinion on its face applies only to primary-line cases, not secondary-line cases. As a result, given the legislative history and statutory language distinctions, we will not presume, without more guidance, that the Supreme Court intended in *Brooke Group* to alter the well-established rule that it adopted in *Morton Salt*.[9] Thus, we hold that the *Morton Salt* rule continues to apply to secondary-line injury cases such as the present one.

■ The *Morton Salt* rule provides that, for the purposes of secondary-line claims under section 2(a), "injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls City Industries v. Vanco Beverage, Inc.,* 460 U.S. 428, 435, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983) (citing *Morton Salt,* 334 U.S. at 46, 50–51, 68 S.Ct. at 828, 830). If the plaintiff makes such a showing, then "[t]his inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." *Falls City,* 460 U.S. at 435, 103 S.Ct. at 1288. Barring evidence breaking that connection, however, "for a[ ] plaintiff to prove competitive injury under Robinson–Patman, he [or she] need only show that a substantial price discrimination existed as between himself [or herself] and his [or her] competitors over a period of time." *Hasbrouck v. Texaco, Inc.,* 842 F.2d

1034, 1041 (9th Cir.1987), *aff'd,* 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990).

Here the jury properly inferred *prima facie* injury to competition since Coastal produced sufficient evidence before the jury to conclude (1) that the discrimination in question was continuous and substantial and (2) that the discrimination occurred in a business where profit margins were low and competition was keen. 4 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 31.04(1). First, the discrimination lasted all 18 months that Coastal was in business, and always exceeded the five cents per barrel that witnesses testified was competitively significant. Additionally, there was ample testimony that the marine fuel oil business, in which Coastal competed against Caribbean and Harbor, was characterized by thin margins and intense competition. At any rate, on appeal, CAPECO does not make the argument that Coastal failed to produce evidence required for a *prima facie* showing of injury to competition under the *Morton Salt* rule.

■ However, CAPECO argues that the *Morton Salt* inference was undercut by evidence "breaking the causal connection" between CAPECO's price discrimination and Coastal's lost sales or profits, *Falls City,* 460 U.S. at 435, 103 S.Ct. at 1288, and showing an absence of competitive injury, *Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1146 (D.C.Cir.1988). According to CAPECO, overall market forces depressed the price for bunker fuel more than 30 percent between late 1991 and early 1992, and it was this fact, rather than CAPECO's price discrimination, that led to Coastal's demise. CAPECO points to the admission of Coastal's CEO that Coastal's sales agents based their price quotes to ships on the prices being charged by competitors in San Juan and other ports, often without even knowing the cost of the fuel that was to be delivered. According to CAPECO, if prices were set when costs were unknown, then discounts from CAPECO

---

9. While concerns about overenforcement harming overall consumer welfare may be valid, the Supreme Court retains the option of speaking further on this issue. *See generally* Paul Larule, *Robinson–Patman Act in the Twenty–First Century: Will the Morton Salt Rule Be Retired?* 48 S.M.U.L.Rev. 1917, 1927 (1995) (concluding that

"[w]hen an appropriate case comes before it, the [Supreme] Court may well decide to make the final cut"); Hovenkamp § 14.6a (arguing that, after *Brooke Group,* "a reinterpretation of Robinson–Patman so as to permit secondary-line injury only when competition itself is threatened is long overdue").

could not have been a material factor in setting prices.

We reject the argument that this evidence rebuts Coastal's *prima facie* showing of price discrimination. In reviewing the jury verdict, "[w]e are compelled ... even in a close case, to uphold the verdict unless the facts and inferences, when viewed in a light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd–Angier Production Co. v. Omni Publications Int'l Ltd.*, 756 F.2d 930, 934 (1st Cir.1985); *see also Rodríguez v. Montalvo*, 871 F.2d 163, 165 (1st Cir.1989); *Castro v. Stanley Works*, 864 F.2d 961, 963 (1st Cir. 1989); *Brown v. Freedman Baking Co.*, 810 F.2d 6, 12 (1st Cir.1987). Thus, in this case, the appellants must "persuade us that the facts of this case so conclusively point to a verdict in [their] favor that fair-minded people could not disagree about the outcome." *Chedd–Angier Production Co.*, 756 F.2d at 934.

Here, neither section 2(a), section 263, nor their attendant case law, requires that the price discrimination in question be directly factored into the prices that favored and disfavored purchaser-resellers offered to their customers. Presumably, regardless of whether these costs were factored directly into the prices that Coastal offered, or were later calculated into Coastal's bottom line, these costs affected Coastal's pricing. Certainly, no argument can be made from this evidence alone that bunker fuel costs, no matter when accounted for, were not causally connected to Coastal's lost profits. *See, e.g., Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1039–41 (9th Cir.1987), *aff'd*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) (finding that evidence that "some portion" of small extra discounts of 2¢–5¢ on gasoline was passed on by favored customers sufficient, particularly when retail gasoline market was "strongly price sensitive"). Additionally, the fact that Coastal's sales agents operated without complete knowledge of the prices at which other Coastal agents were

purchasing the bunker fuel that would later be delivered does not, without more, show an absence of competitive injury.

### 3. Actual Injury

CAPECO also contends that Coastal failed to present adequate evidence of actual injury to support the verdict. On appeal, CAPECO does not complain that the court's instructions to the jury on the actual injury requirement were erroneous. Thus, the only question regarding this issue is whether the evidence that Coastal presented to the jury was adequate to permit a reasonable inference of actual injury.

■ Although we have concluded that Coastal has proved competitive injury under Title 10, Section 263 of the Laws of Puerto Rico, in order to collect damages as a private plaintiff, Coastal must show that CAPECO's offense was a "material cause" of injury. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Hasbrouck*, 842 F.2d at 1042; *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 21–22 (1st Cir.1981). Coastal was required to show that, as a result of CAPECO's price discrimination, it "lost sales and profits." *Hasbrouck*, 842 F.2d at 1042; *see Allen Pen Co.*, 653 F.2d 17, 21–22 (1st Cir.1981). CAPECO contends that, to do so, Coastal was required to "indicate and document specific losses of business [for Coastal] and corresponding gains by [favored competitors], or otherwise show that [Coastal's] losses were caused by [CAPECO's] practices." *Foremost–McKesson, Inc. v. Instrumentation Laboratory, Inc.*, 527 F.2d 417, 420 (5th Cir.1976); *see also Falls City*, 460 U.S. at 437–38, 103 S.Ct. at 1290 (ruling that findings based on "direct evidence of diverted sales" "more than established the competitive injury required for a prima facie case under section 2(a)").

■ Assuming arguendo that CAPECO correctly claims that Coastal needed to show specific losses of business, CAPECO's argument fails to persuade us.[10] CAPECO con-

---

**10.** There is conflicting authority for the proposition that a jury may infer actual injury from

circumstantial evidence. *See Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 697–700,

cedes that a Coastal employee, Andrew McIntosh ("McIntosh") testified that Coastal was getting "feedback" from its customers that its prices were not competitive. Whether or not to credit such testimony is a decision best left to the factfinder. *See Wytrwal v. Saco School Bd.,* 70 F.3d 165, 171 (1st Cir.1995); *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 204 n. 4 (1st Cir.1995). McIntosh's testimony, if believed, could lead a jury to reasonably infer actual injury in the form of lost sales.

CAPECO also contends that because McIntosh's testimony was based on statements other Coastal employees had made to him, it was both inadmissible hearsay evidence, *see* Fed.R.Evid. 802, and even if admissible, legally insufficient to support a finding of actual injury. In making this argument, CAPECO cites two cases, *Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.,* 63 F.3d 1267, 1275–76 (3d Cir. 1995), and *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 581 (5th Cir.1982). However, the two cases are inapposite. Apparently unlike the defendant in *Stelwagon,* CAPECO did not make a lower court hearsay objection to the testimony in question. *See Stelwagon Mfg. Co.,* 63 F.3d at 1275, n. 17.

Additionally, the Fifth Circuit's opinion in *J. Truett Payne* is distinguishable in a significant manner from the instant case. In a preceding Supreme Court opinion, the Court noted that

> [a]lthough [Payne Co.'s owner] asserted that his salesmen and customers told him that the dealership was being undersold, he admitted that he did not know if his competitors did in fact pass on their lower costs to their customers.

*J. Truett Payne, Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 564, 101 S.Ct. 1923, 1928, 68 L.Ed.2d 442 (1981). Likewise, Payne Co.'s expert witness did not testify that the lower costs were passed on in the retail price. *Id.* The Court found important the lack of evidence that competitors passed on

discounts to customers. *Id.* at 564, n. 4, 101 S.Ct. at 1928, n. 4. On remand, the Fifth Circuit noted, in finding the evidence insufficient, that Payne Co.'s witnesses only "spoke to either the supposed or hypothesized effect of the programs." *J. Truett Payne,* 670 F.2d at 581. By contrast, while Coastal offered similar testimony of feedback about being undersold, it also put forth expert testimony that Caribbean and Harbor had fully passed on their lower costs to the ships purchasing marine fuel. Coastal's expert testified that "CAPECO gave discriminatory low prices to Harbor and Caribbean ... [that] were fully passed on ... to the ships purchasing marine fuel." Thus, because Coastal proffered evidence linking the discounts in question to actual, not hypothetical, effects, *J. Truett Payne* is inapposite.

We conclude that, once admitted, this evidence could have led the jury to reasonably infer actual injury to competition.

## B. Monopolization

■ Section 2 of the Sherman Act, 15 U.S.C. § 2, condemns "every person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States." Similarly, Title 10, Section 260 of the Laws of Puerto Rico tracks this language. Claims under this Puerto Rico analogue are to be analyzed in the same manner as claims under section 2 of the Sherman Act. *See R.W. Intern. Corp. v. Welch Food, Inc.,* 13 F.3d 478, 486–88 (1st Cir.1994); *Americana Indus., Inc. v. Wometco de Puerto Rico,* 556 F.2d 625, 626–28 (1st Cir.1977); *see also Pressure Vessels of Puerto Rico v. Empire Gas of Puerto Rico,* 94 JTS 144, *432 (P.R.1994). To successfully prove a monopolization offense, a plaintiff must show that (1) the defendant has monopoly power and (2) the defendant "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." Hovenkamp ´§ 6.4a. On appeal, CAPECO challenges the jury's verdict that it had monopoly

---

82 S.Ct. 1404, 1409–1411, 8 L.Ed.2d 777 (1962). However, we need not consider here whether this standard, which is more favorable to Coastal, applies rather than the standard that CAPECO

advocates, since Coastal actually did proffer evidence, albeit only employee testimony, that its prices were causing it to lose business.

power, and also contends that it did not engage in impermissible 'exclusionary' practices in order to protect or gain a monopoly.

■ To determine whether a party has or could acquire monopoly power in a market, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993). CAPECO's first argument is that the jury erred in finding San Juan Harbor as the relevant geographic market for bunker fuel. In general, the relevant geographic market consists of "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." *Baxley–DeLamar v. American Cemetery Assn.,* 938 F.2d 846, 850 (8th Cir.1991); *see also Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961).

In its monopolization claim, Coastal argued that CAPECO took steps to drive it out of San Juan Harbor because Coastal is affiliated with a refinery in Aruba. Coastal apparently had the capacity to import the residual oil and diesel into San Juan from Aruba. Coastal also had storage capacity. CAPECO feared, so Coastal's theory went, that this would allow the refinery in Aruba to compete with CAPECO and threaten CAPECO's ability to sell its targeted 10,000 barrels of residual oil per day to dealers. Coastal's argument is that CAPECO, fearing that Coastal's affiliate posed a competitive threat, decided to drive Coastal out by (1) engaging in price discrimination against Coastal, (2) discriminating in the provision of residual oil, (3) discriminating in the quality of the residual oil available, and (4) threatening to cut off plaintiff entirely, eventually doing so.

Coastal successfully argued to the jury that the relevant geographic market was San Juan Harbor, since neither it nor its competitors, Caribbean and Harbor, could practicably obtain supplies in San Juan Harbor from anyone other than CAPECO. Coastal produced evidence that CAPECO made 90% of the sales of bunker fuel to resellers in the

San Juan Harbor market—and CAPECO does not dispute this figure on appeal.

CAPECO's main argument regarding monopoly power is that the choice of San Juan Harbor as the relevant market was incorrect. Instead, it maintains that because the broader market for bunker fuel among cruise ships and other vessels plying the waters of the Caribbean and the southeastern United States constrains the prices CAPECO can charge resellers in San Juan Harbor, the proper geographic market should have been defined to include a much wider area. A larger geographic market would of course lead to a lower figure for the percentage of sales in the market made by CAPECO, likely defeating the monopoly power prong of the monopolization offense.

In assessing CAPECO's argument, we must bear in mind that "market definition is a question of fact" and "we therefore must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion." *Weiss v. York Hospital,* 745 F.2d 786, 825 (3d Cir.1984); *see also Rebel Oil Co.,* 51 F.3d at 1435 (stating that standard upon motion for directed verdict, judgment notwithstanding the verdict, and summary judgment is "whether the jury, drawing all inferences in favor of the nonmoving party, could reasonably render a verdict in favor of the nonmoving party in light of the substantive law") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–2512, 91 L.Ed.2d 202 (1986)).

■ In order to show that CAPECO had monopoly power, Coastal was required to show that CAPECO had sufficient market power to raise price by restricting output. IIA Phillip E. Areeda et al., *Antitrust Law* ¶ 501 (1995). "[S]ubstantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against [a] rival's entry or expansion that would erode such supracompetitive prices and profits." *Id.* Market power can be shown through two types of proof. A plaintiff can either show direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted out-

put) or circumstantial evidence of market power. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Market power may be proved circumstantially by showing that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run. *Id.* Coastal's evidence at trial was of the circumstantial type and thus the question the parties have presented on appeal is whether Coastal supplied sufficient evidence for that CAPECO had a dominant share in the relevant market.

Before determining market share, however, the relevant geographic market must be defined.[11] Although, "[f]inding the relevant market and its structure is not a goal in itself but a surrogate of market power," *see* Areeda, *supra,* ¶ 531a, "[m]arket definition is crucial." *Rebel Oil Co.,* 51 F.3d at 1434. "Without a definition of the relevant market, it is impossible to determine market share." *Id.* Proving market definition is the plaintiff's burden. *See H.J., Inc. v. Int'l Tel. & Tel. Corp.,* 867 F.2d 1531 (8th Cir.1989) ("The plaintiff carries the burden of describing a well-defined relevant market, both geographically and by product, which the defendants monopolized."); *Neumann v. Reinforced Earth Co.,* 786 F.2d 424 (D.C.Cir.) ("The plaintiff bears the burden of establishing the relevant market."), *cert. denied,* 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986); *M.A.P. Oil Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303, 1306 (9th Cir.1982) ("the proponent of [the monopolization] theory must identify the relevant product and geographic markets as a threshold requirement"). Although Coastal has properly pointed out that the question of market definition is one of fact for the jury, a plaintiff must present sufficient evidence from which a reasonable jury could find the existence of the proposed relevant market.

*Cf. Flegel v. Christian Hosp. Northeast–Northwest,* 4 F.3d 682 (8th Cir.1993) (affirming grant of summary judgment on grounds that there was insufficient evidence to support plaintiffs' proposed market definition).

■ A market may be any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market. Areeda, *supra,* ¶ 533b; *see also Rebel Oil Co.,* 51 F.3d at 1434 (relying on Professor Areeda's formulation of the test for the relevant market). "The definition of relevant market depends upon economic restraints which prevent sellers from raising prices above competitive levels." *H.J., Inc.,* 867 F.2d at 1537.

■ Coastal and CAPECO have presented two competing conceptions of the relevant market. Coastal argues, and the jury found,[12] that the relevant market was the market for residual oil for bunker fuel in San Juan. Coastal presented evidence that resellers in San Juan (Harbor, Caribbean and Coastal) purchased 90% of their supplies for bunker fuel from CAPECO. CAPECO, in contrast, has argued that the relevant market is broader, consisting of all sales of residual oil for bunker fuel in the Caribbean and Southeastern United States. Our review of the issue leads us to conclude that it would be unreasonable for a juror to infer from the evidence presented that the sales of residual oil for bunker fuel outside of San Juan should be excluded from the relevant market.

The residual oil CAPECO sells is blended with diesel into bunker fuel and sold by resellers like Coastal, Harbor and Caribbean to large ocean-going vessels. Residual oil refiners and bunker fuel resellers exist throughout the Caribbean and Southeastern United States. The parties agree that the

---

11. The plaintiff must also define the relevant product market. *H.J., Inc. v. Int'l Tel. & Tel. Corp.,* 867 F.2d 1531, 1537 (8th Cir.1989). The parties agree that the relevant product market is residual fuel oil sold by all refineries for use as bunker fuel for ocean-going vessels.

12. The jury answered "yes" to the special interrogatory asking "Did Coastal establish that there is a relevant market comprising of the sale of residual fuel oil or diesel to bunker fuel resellers in the port of San Juan and that CAPECO has monopoly power in the relevant market?"

ocean-going vessels can choose to refuel from whatever supplier in the Caribbean and Southeastern United States offers the best terms as to price, quality and dependability. The market for bunker fuel is therefore extremely fluid and competitive, as the parties agree.

Coastal argues that, because of this competition, margins for resellers are razor thin and it is virtually impossible for a reseller in San Juan, like Coastal, to obtain residual oil from anyone other than CAPECO. Transporting supplies from other refineries, such as the refinery Coastal is affiliated with in Aruba, would increase the cost of the fuel to such an extent (transportation costs, import taxes, risk of price changes, and storage costs) that it is not an economically viable alternative. (Of course, this is, it might be observed, somewhat inconsistent with the theory that CAPECO was so afraid of the 'threat' from Coastal and its Aruba affiliate, that it drove Coastal out of business.) Consequently, Coastal argues, resellers of bunker fuel must purchase from CAPECO when they do business in San Juan. In Coastal's view, the San Juan resellers' inability to purchase from suppliers outside of San Juan makes San Juan the relevant market.

We do not agree. The touchstone of market definition is whether a hypothetical monopolist could raise prices. *See Rebel Oil Co.,* 51 F.3d at 1434. Although a reseller based in San Juan may have nowhere else to turn to in San Juan for its fuel, Coastal did not produce sufficient evidence that this meant CAPECO has the ability to restrict supply and raise prices in San Juan to supracompetitive levels. Indeed, the evidence points in the other direction. CAPECO cannot sell its residual oil for bunker fuel unless it does so at a price at which the resellers will be able to sell the fuel to its ultimate consumers, the ocean-going vessels. Those ocean-going vessels can go anywhere in the Caribbean and Southeastern United States to get their bunker fuel. If CAPECO were to raise its prices to the resellers, the resellers could not offer the bunker fuel to the ocean-going vessels at competitive prices and the ocean-going vessels would simply get their fuel at another port.

Given these facts, the immobility of the resellers does not mean that CAPECO could maximize profits by raising prices significantly above the competitive level. Raising prices in San Juan would repel the ultimate consumers, who would seek other suppliers. The resellers would either stop purchasing residual fuel or cease business, or both. CAPECO would then lose its ability to sell its residual oil for bunker fuel and this would redound to the benefit of CAPECO's competitors. While under most circumstances the immobility of the resellers would be of considerable importance in defining the market, it does not control here where the mobility of the ultimate consumers protects the immobile resellers. *Cf. Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325 (7th Cir.1986) (Easterbrook, J.) (relevant market for purposes of health insurance coverage to Indiana consumers was "regional or national" not simply Indiana, even though Indiana consumers could not get insurance from any source other than defendant doing business in Indiana; the mobility of potential rivals to the defendant protected the consumers whose mobility was restricted). Under the circumstances here, defining the market as San Juan is too narrow. It does not capture the likelihood of expanded sales by CAPECO's rivals in the event that CAPECO were to raise prices in San Juan.

■ Once the relevant market is defined to include a geographic region larger than San Juan (*i.e.,* the Caribbean and Southeastern United States), Coastal has not satisfied its burden of showing that CAPECO had a dominant market share. While Coastal might, at least in theory, have shown that all refineries throughout the Caribbean and the Southeastern United States behaved like a cartel and priced their residual oil to capture the transportation and other costs of getting oil from sources outside the local ports, it has not done so here and it has failed to produce evidence sufficient for a reasonable jury to infer that such was the case. In short, Coastal has not shown that CAPECO had monopoly power over the relevant market. *Cf. Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 886–87 (9th Cir.1982) (secondary-line price discrimination under Robinson–Patman

Act does not necessarily violate Sherman Act), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Accordingly, Coastal's monopolization claims fail under both section 2 of the Sherman Act and Title 10, Section 260 of the Laws of Puerto Rico and we reverse the monopolization verdicts. We note that because we affirm the price discrimination verdict, the reversal on the monopolization theory, by itself, leaves unchanged the amount of antitrust damages awarded, subject to our discussion on damage evidentiary sufficiency in Part I.D., *infra*.

### C. Puerto Rico Law Tort

CAPECO also challenges the judgment on Coastal's claim under 31 L.P.R.A. 5141 ("Article 1802").[13] CAPECO claims that Coastal was required to allege and prove the elements of a recognized tort, and failed to do so. According to CAPECO, because the Supreme Court of Puerto Rico has recently declined to rule that violation of an antitrust statute will also necessarily give rise to a violation of Article 1802, the violation of an antitrust statute does not give rise to a *per se* violation of Article 1802. *See Pressure Vessels of Puerto Rico*, 94 JTS 144, *438–39. Additionally, CAPECO challenges the sufficiency of the evidence supporting the judgment on this issue. CAPECO asks for a reversal of the verdict on these grounds.

■ CAPECO's arguments may well have merit. However, we need express no opinion regarding CAPECO's arguments as CAPECO waived them by failing to object to the jury instructions regarding the Article 1802 claim. *See Linn v. Andover Newton Theological School, Inc.*, 874 F.2d 1, 5. These are not simply technical requirements. By failing to object to the jury instructions, CAPECO denied "the judge an opportunity to correct his error," assuming that CAPECO rightly contends that an error was made.

*Id.* While CAPECO may correctly contend that antitrust violations do not fall within the scope of Article 1802, the district court's jury instructions were not strictly limited to antitrust offenses. It is entirely possible that, had an objection been made, the district court could have charged the jury with antitrust offenses as an Article 1802 ground separately from other Article 1802 grounds that may have applied in the present case. For example, it could have charged the jury with tortious interference with contractual relations, since CAPECO may well have intentionally complicated, via its refusal to deal, Coastal's efforts to meet its obligations to deliver bunker fuel. *See General Office Products Corp. v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077, 1081 (1st Cir.1986) (noting that even in the absence of a contract, liability may be incurred under other judicial principles) (citing *General Office Products Corp. v. A.M. Capen's Sons, Inc.*, No. 0–84–278, Trans.Op. at 6–7 (P.R. June 29, 1984)). By failing to object to the instructions in question, CAPECO has deprived us of factual findings that would aid in the resolution of these issues. Because of the generality of the instruction, we conclude that evidence existed of CAPECO's possibly tortious conduct sufficient for the jury to reasonably reach the verdict that it did.

■ CAPECO also challenges the sufficiency of the evidence supporting the Article 1802 findings. However, CAPECO has waived review here of this argument too by failing to move at any time for a judgment as a matter of law on this ground under Fed. R.Civ.P. 50(a), *see Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803, 810 (1st Cir.1988) ("[a]ppellate review may be obtained only on the specific ground stated in the motion for directed verdict").[14]

As a result of CAPECO's failure to preserve its arguments for review on appeal, we

---

13. Article 1802 states, in pertinent part, that:
 [a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.
 *Id.*

14. In 1991, Rule 50 was amended, and the term "judgment as a matter of law" was adopted "to

refer to preverdict" (directed verdict) and "postverdict" (judgment notwithstanding the verdict) "motions with a terminology that does not conceal the common identity of two motions made at different times in the proceeding." *See* Fed. R.Civ.P. 50 advisory committee's note.

affirm the judgment on the Article 1802 claim.

### D. Sufficient Evidence on Damages

CAPECO also argues that Coastal's evidence on damages was inadequate as a matter of law, and therefore, the jury's verdict on damages must be reversed. In particular, CAPECO argues that, as a new market entrant, Coastal was required to use the "yardstick" method of estimating damages.

With respect to the issue of how accurately damages must be measured, "there is a clear distinction between the [relatively high] measure of proof necessary to establish that [a plaintiff] has sustained some damage and the [relatively low] measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). In the antitrust context, "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 256, 66 S.Ct. 574, 576, 90 L.Ed. 652 (1946). Nonetheless, the plaintiff must still produce evidence from which the jury can make a just and reasonable inference. *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803, 816 (1st Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).

■ Citing *Home Placement Service v. The Providence Journal Co.*, 819 F.2d 1199 (1st Cir.1987), CAPECO argues that Coastal was required to use the yardstick method for calculating lost profits, rather than the "before-and-after" method. *Id.* at 1205–06. Under the yardstick approach, the plaintiff attempts to identify a firm similar to the plaintiff in all respects but for the impact of the antitrust violation. Hovenkamp § 17.6b2. By contrast, under the "before-and-after" method, the court looks at the plaintiff's business before the violation occurred, during the violation period, and after the violation ended, and estimates the amount by which the violation reduced the plaintiff's profits. *Id.* § 17.6b1.

We conclude that whether a yardstick record must be used ultimately requires an appraisal of the reliability of a firm's track record, and the length of that track record is one factor to consider. The plaintiff in *Home Placement Service* had operated as planned only weeks before the alleged violations began. *Home Placement Service* can best be read as demonstrating both the type of situation in which a yardstick method is preferable, and the factors that should go into a court's evaluation of the comparability of the yardstick firm or firms with the plaintiff.[15]

■ Ultimately, the proper method should be determined by the district court in accord with the facts of the situation. In this case, the district court will have exactly that opportunity, since we must vacate the district court's damages award and remand for further proceedings. The district court charged the jury with an instruction to find an amount for "antitrust damages," comprising awards for both price discrimination and monopolization claims.[16] Because we reverse the monopolization verdict, if left to stand, the jury's antitrust damages award would likely constitute an excessive recovery. In coming to its conclusion, the jury may well have weighed harms resulting from conduct that was pleaded with respect to the monopolization offense (*e.g.* refusal to deal with a customer, lying, etc.) but would have been

---

**15.** We note in passing that the plaintiff-appellant in *Home Placement Service* was challenging the district court's award of nominal damages and instead sought damages based on a yardstick analysis; the appeals court upheld the nominal damages finding because the evidence was "not 'sufficient to get the Court beyond the guessing stage.'" *Id.* at 1209 (quoting *William Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F.Supp. 103, 106 (E.D.Pa.1946), *aff'd*, 164 F.2d 1021, 1022 (3d Cir.1947), *cert. denied*, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948)).

**16.** We understand the difficult choice that the district court faced. As a practical matter, it would be difficult, if not impossible, for a juror to segregate antitrust damages due to a monopolization offense but not due to illegal price discrimination from antitrust damages due only to price discrimination, where as here, the facts and conduct involved in both allegations greatly overlap. .

additional to harms resulting from price discrimination, the claim we uphold. Furthermore, were we to allow the verdict to stand despite our reversal of the monopolization verdict, there would exist the strong likelihood that the jury had granted Coastal a duplicative recovery under monopolization and tort law, for injury caused by the same conduct, such as refusal to deal and lying. The law "abhors duplicative recoveries." *Dopp v. HTP Corp.*, 947 F.2d 506, 517 (1st Cir.1991) (vacating damage award for, among other reasons, "a strong likelihood that the remedies thus far conferred overlap"). Thus, we find that the district court's award rests on an error of law. *See Adams v. Zimmerman*, 73 F.3d 1164, 1171, (1st Cir.1996) (stating that a "district court's award is reviewed for an abuse of discretion unless it relies on an erroneous legal determination"). As a result, we must vacate the antitrust damage award of $4.5 million ($1.5 million trebled), and remand for further proceedings.

## II. Arguments for a New Trial

In addition to its arguments for reversal of the district court's findings, CAPECO makes several arguments for reversal of the district court's denial of its motion for a new trial.

■■■ "The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980), *cited in Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 810 (1st Cir.1988). "Only abuse of discretion will trigger reversal of a denial of a motion for new trial." *Velázquez v. Figueroa–Gómez*, 996 F.2d 425, 427 (1993). In reviewing for abuse of discretion, we must bear in mind that the trial court's discretion is quite limited concerning motions for new trials. "A trial judge may not upset the jury's verdict merely because he or she would have decided the case differently." *Id.*

### A. Duplicative Judgment

In support of its request for a new trial, CAPECO argues that the damages awards constituted an impermissible double recovery. CAPECO contends that both Coastal's antitrust and tort claims were grounded in the same set of acts. Because we vacate and remand the antitrust damages for further findings on price discrimination damages, we construe CAPECO's argument that price discrimination and tort damages would constitute duplicative damage recoveries, *see Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 382 (1st Cir.1991) ("recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory"), and so a new trial or remittitur is required, *see Dopp v. HTP Corp.*, 947 F.2d 506, 516 (1st Cir.1991).

■■■ We reject this argument for three reasons. First, CAPECO failed to object to the form or content of the special interrogatories to which the jury answered. Second, CAPECO may well have waived its right to raise this issue here, since it failed to raise the issue in a timely manner with the trial court. Previously, we have held that a defendant may not argue verdict inconsistency if he or she failed to object "after the verdict was read and before the jury was discharged." *See McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 134 (1st Cir.1987). This rule is grounded in the realization that "to decide otherwise would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'" *Id.* (quoting *Merchant v. Ruhle*, 740 F.2d 86, 92 (1st Cir.1984)). The same concern should make us hesitate to consider arguments about verdict redundancy that were similarly not put forth below.

■■■ Finally, "[a] special verdict will be upheld if there is a view of the case which makes the jury's answers consistent." *McIsaac*, 809 F.2d at 133. As we have noted above, Coastal may have had a legitimate Article 1802 claim apart from any overlap with antitrust law. Had CAPECO chosen to object to the district court's instructions, the district court may have corrected this problem. Accordingly, giving the district court the benefit of the doubt, had it responded to a timely objection by CAPECO and given an Article 1802 instruction that did not overlap with antitrust claims, the jury's damages ver-

dicts on tort and antitrust claims could have been consistent. Even assuming, *arguendo,* that CAPECO correctly asserts that such overlap occurred, to grant CAPECO a new trial now on the basis of duplicative recovery would allow it to avoid the result of its own failure to object to the Article 1802 instruction.

### B. CAPECO's Experts

Additionally, CAPECO argues that the district court's refusal to allow its two experts, Dr. Jorge Freyre ("Dr. Freyre") and Dr. Elías Gutiérrez ("Dr. Gutiérrez"), to testify was based on a fundamental error of law and was an abuse of discretion that requires that we reverse the district court and order a new trial.

In order to evaluate CAPECO's contentions, we must review the district court's orders leading up to the exclusion of the relevant testimony. The district court's June 22, 1993 Scheduling Order stated that "[t]he parties will announce the names and qualifications of their experts by October 1, 1993." This date was modified subsequently to December 1, 1993. In compliance with this order, CAPECO named César Figueroa ("Figueroa") and Rafael Martínez–Margarida ("Martínez–Margarida"). On March 1, 1994, pursuant to a motion by new counsel for Caribbean, the district court modified the previous order and issued a revised scheduling order stating "all experts are to be announced by March 30," and also specifying that expert reports to be used "during each party's case-in-chief" were to be exchanged on June 3, 1994, and that expert rebuttal reports were to be exchanged on July 1, 1994. Upon CAPECO's June 1 motion, the date for reports to be exchanged was extended by an "Omnibus Order" to ten days after service of that order, dated August 15, 1994. On August 29, 1994, Coastal delivered to CAPECO expert reports prepared by Dr. Sherwin and Dr. Zalacain, and CAPECO provided Coastal with an expert report prepared by Figueroa. These experts were deposed between September 9 and September

14, and thereafter CAPECO retained experts Dr. Freyre and Dr. Gutiérrez ostensibly as rebuttal witnesses under Fed.R.Civ.P. 26(a)(2)(C). CAPECO informed Coastal on September 20, 1994, that it had retained Dr. Freyre as a rebuttal witness, and similarly informed Coastal of Dr. Gutiérrez on or about October 4, 1994. CAPECO informed the district court about Dr. Freyre and Dr. Gutiérrez on October 5, 1995.

The district court instructed CAPECO to produce Dr. Freyre and Dr. Gutiérrez and to make them available for depositions. On October 5 and October 6, Coastal filed motions in limine to exclude Dr. Freyre and Dr. Gutiérrez, respectively, on the theory that neither witness could properly be characterized as a "rebuttal" witness within the meaning of Rule 26(a)(2)(C), and thus both should have been disclosed previously. After oral argument, the district court granted Coastal's motion and excluded the testimony of Dr. Freyre and Dr. Gutiérrez. The district court, upon CAPECO's admission that it planned to use Dr. Freyre and Dr. Gutiérrez in its case-in-chief, noted that "you got a problem with my orders because you have not complied with my orders insofar as Freyre and Gutiérrez [are] concerned," apparently referring to the previous scheduling order deadline for experts in the case-in-chief to be disclosed.

 CAPECO argues (1) that because the Omnibus Order did not provide a deadline for the exchange of rebuttal expert reports, no scheduling order applied, and therefore the disclosure of Dr. Freyre and Dr. Gutiérrez was controlled by Rule 26(a)(2)(C);[17] and (2) that the district court misconstrued Rule 26(a)(2)(C) to signify that a defendant cannot offer testimony to "contradict or rebut" under Rule 26(a)(2)(C). We need not consider whether the district court in fact misconstrued Rule 26(a)(2)(C), because, for three reasons, we find no abuse of discretion in its exclusion of these witnesses as rebuttal witnesses. First, at no time did

---

**17.** Rule 26's schedule concerning the duty to disclose information concerning expert witnesses and their opinions may be altered by the court. *See* Fed.R.Civ.P. 26(a)(2)(C) (setting forth sched-

ule of disclosure of expert testimony "[i]n the absence of other directions from the court or stipulation by the parties").

CAPECO ever seek leave of the court to announce the names of experts not disclosed by December 1, 1993, as originally required, or by March 30, 1994, as permitted by the trial court. CAPECO's motion of June 1 sought extension principally due to alleged noncooperation by Coastal in discovery, making CAPECO's experts' task difficult to complete by the deadline then in effect. We cannot conclude, as CAPECO does, that the Omnibus Order's extension rendered all other orders unbinding. Because CAPECO did not ask for its extension on the grounds it now argues, the district court could not have had such an effect in mind, nor was it given an opportunity to consider such effect. A trial court may "readily exclude a witness or exhibit if some previous order had set a deadline for identification and the proponent [has], without adequate excuse, failed to list the witness or exhibit." *Fusco v. General Motors Corp.*, 11 F.3d 259, 265 (1st Cir.1993); *see also Freund v. Fleetwood Enter., Inc.*, 956 F.2d 354 (1st Cir.1992).

■ Additionally, we cannot agree that the district court's March 1, 1994, Scheduling Order was necessarily superceded, given that that order scheduled trial for October 24, 1994, and in fact, trial began on that date. The proximity in time between CAPECO's attempts to bring in Dr. Freyre and Dr. Gutiérrez and actual trial casts doubt on any argument that CAPECO was somehow misled into thinking that previous Scheduling Orders did not apply. Finally, even assuming that CAPECO is correct that the Scheduling Order's provisions regarding rebuttal witnesses had been superceded and thus Rule 26(a)(2)(B) applied, the district court might still have enforced its previous deadlines regarding experts in the case-in-chief. For better or for worse, at oral argument on October 21, 1994 (three days before trial was to start), counsel for CAPECO identified Dr. Freyre and Dr. Gutiérrez as witnesses in its case-in-chief.[18]

Given the circumstances, we cannot conclude that the exclusion of the testimony of

Dr. Freyre and Dr. Gutiérrez was an abuse of discretion warranting a new trial.

## C. CAPECO's Meeting Competition Defense

■ CAPECO also argues that the district court should have given jury instructions on the affirmative defense of meeting competition. Section 2(b) of Clayton Act, as amended by the Robinson–Patman Act, permits a defendant to rebut a *prima facie* case of violation by showing that its lower price "was made in good faith to meet an equally low price of a competitor." 15 U.S.C. § 13(b). The "meeting competition" defense can be raised only by a defendant who responds in good faith to the believed lower price of a competitor. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), *appeal after remand*, 600 F.2d 414 (3d Cir.1979), *cert. denied*, 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).

■ We need not consider CAPECO's argument that it believed in good faith that it was responding to a competitive threat posed by Coastal in combination with its parent CFMI, because we conclude that even assuming that Coastal and CFMI were a single entity, they do not constitute a competitor in the same specific area as CAPECO, *see Falls City*, 460 U.S. at 448, 103 S.Ct. at 1295. In *Falls City*, the Supreme Court concluded that Congress intended the meeting competition defense "to allow reasonable pricing responses on an area-specific basis where competitive circumstances warrant them." *Id.* at 448, 103 S.Ct. at 1295. Here, the district court could reasonably conclude that the defense did not apply, since there was a lack of evidence, beyond CAPECO's own employees' testimony about what they believed to be the case, that CFMI offered lower prices on bunker fuel in San Juan than CAPECO. *See Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 391–93 (8th Cir.1987) (ruling defense rejected where seller relied on "assumption or speculation" without verification that competitor's prices were in fact

---

18. At one point in the oral argument over Coastal's motion in limine to exclude Dr. Freyre and Dr. Gutiérrez, the court asked "And when are you going to bring them?" To this question, counsel for CAPECO directly responded, "We are going to use [them] in our case [in] chief."

lower). Therefore, we do not find abuse of discretion in the district court's denial of a new trial based on its refusal to issue a jury instruction on the meeting competition defense.

### D. CAPECO's Puerto Rico Law Tort Counterclaim

CAPECO contends that the district court erred in dismissing its counterclaim grounded in Article 1802, 31 L.P.R.A. § 5141. According to CAPECO, it was a compulsory counterclaim and was thus not barred by the one year statute of limitations, at least to the extent of defeating the main claim.

We reject CAPECO's argument for two reasons. First, in opposition to Coastal's motion for summary judgment on the counterclaim, it failed to inform the district court of the theory it now advances, that it is entitled to recoupment notwithstanding the statute of limitations. Additionally, the gist of CAPECO's counterclaim argument was that the threat posed by Coastal and CFMI allegedly working in concert forced CAPECO to give Harbor and Caribbean discounts, costing CAPECO potential profits. Given that we uphold the district court's finding that these discounts were illegal price discrimination, it appears at least doubtful under Puerto Rico law that CAPECO can collect for any lost profits thereby incurred. *See, e.g., Rubio–Sacarello v. Roig,* 84 D.P.R. 344, 351 (P.R.1962) (stating, in a contract context, that one who is guilty of illegality cannot bring an action). As a result, we fail to find abuse of discretion by the district court in its decision not to grant a new trial on this basis.

### CONCLUSION

Coastal succeeded below on three claims: price discrimination, monopolization and tort. CAPECO's failure to make the points below that it now argues on appeal hamstrung its attempt to obtain reversal of the price discrimination and tort claims. But the definition of relevant market Coastal espoused could not be reasonably adopted by the jury, since this definition was legally insufficient in neglecting to account for downstream constraints on the proposed monopoly, and in failing to draw on sufficient evidence regarding those constraints.

For the foregoing reasons, the judgment of the district court is *affirmed in part, reversed in part,* and *remanded.*