James BENJAMIN, Jr., M.D., Plaintiff,

v.

The AROOSTOOK MEDICAL CENTER,
et al., Defendants.

Civ. No. 95–CV–253–B.

United States District Court,
D. Maine.

Aug. 8, 1996.

James Benjamin Jr., Ann Arbor, MI, pro se.

Christopher D. Nyhan, Preti, Flaherty, Beliveau & Pachios, Portland, ME, George C. Schelling, Gross, Minsky, Mogul & Singal, P.A., Bangor, ME, for Defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, Dr. James Benjamin sues his former employer The Aroostook Medical Center, Inc. ("TAMC" or "the hospital"), a nonprofit hospital located in northern Maine, numerous doctors and other staff members employed at TAMC. Dr. Benjamin filed a five-count Amended Complaint alleging, among other things, violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2, 14, 15, 24, 26, racial discrimination under 42 U.S.C. §§ 1981 and 1983, and malicious abuse of report. Dr. Benjamin proceeds *pro se.*

Defendants have filed numerous motions in response, including a Motion to Bifurcate, several Motions in Limine and a Motion for Summary Judgment. The Court addresses only the Defendants' Motion for Summary Judgment as it is dispositive. For the reasons that follow the Court grants that Motion.

## I. Background

Plaintiff, Dr. Benjamin is a physician of African–American descent, licensed to practice medicine in California, Connecticut, Maine and Minnesota. He maintains a specialty in internal medicine, and is certified by the American Board of Internal Medicine as having a "Specialty of Internal Medicine." Dr. Benjamin previously enjoyed various staff privileges at TAMC, and the loss of those privileges resulting from alleged discriminatory behavior form the basis of this suit. At the time of his termination Dr. Benjamin was the sole African–American physician at TAMC.

TAMC, a nonprofit hospital located in Presque Isle, allegedly maintains "a dominant position within the health care services market in the Presque Isle, Maine area." (Compl., ¶ V.) Neighboring hospitals in Caribou and Houlton are said to be inconvenient to Presque Isle residents. TAMC maintains a staff of approximately forty-five physicians, and only permits physicians with proper privileges to treat patients in its facilities. TAMC receives both state and federal funds for its operations, as well as various tax benefits due to its status as a charitable organization.

In February of 1992, Dr. Benjamin applied for staff privileges at TAMC. He was nei-

ther awarded, nor denied full privileges. Rather the hospital granted him a "provisional appointment," with the intention of reviewing the competency and proficiency of his work before making a decision as to permanent hospital privileges. Dr. Benjamin, however, maintains that his qualifications merited full staff privileges at the time of his original application, and that Caucasian applicants with comparable qualifications were awarded six month trial periods, while his lasted only about six weeks. (Compl. at ¶ XXXVIII.)

Dr. Benjamin claims that discrimination ultimately led to the termination of his clinical privileges in January of 1994. In September of 1993, TAMC first asked Dr. Benjamin to voluntarily resign his hospital privileges. Dr. Benjamin, however, refused. He remained at the hospital, but was allegedly subjected to continual discriminatory treatment by the TAMC staff. Dr. Benjamin claims TAMC discriminated against him in relation to medication orders, assigned nursing responsibilities, and personnel evaluations. In November, 1993, for example, the hospital allegedly failed to honor several discharge orders, and also allegedly unjustly refused to admit and treat one of his patients. TAMC also allegedly reassigned several of Dr. Benjamin's patients to other physicians. As Dr. Benjamin continued to admit patients, the hospital continued to reassign them. Later he was ordered to stop admitting new patients entirely, and ultimately had his privileges suspended upon the recommendation of TAMC's Medical Staff Executive Committee. According to Dr. Benjamin, TAMC never substantiated the grounds for his suspension or his later termination.

This alleged discrimination by TAMC staff members, Dr. Benjamin contends, did not end with the termination of his privileges at TAMC. When Dr. Benjamin applied for a job with the Cary Medical Center in Caribou, Maine, Cary required certain letters of reference and files from TAMC as part of the application process. TAMC refused both requests. Additionally, TAMC filed reports with the National Practitioner Data Bank and Maine State Board of Licensure in Medicine that allegedly unjustly criticized Dr. Benjamin's performance at TAMC. Dr. Benjamin challenges the veracity of these reports, and alleges that TAMC knew this information to be false.

## II. Summary Judgment

### A. Standard

Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Thus it is axiomatic that summary judgment must be denied when disputes remain as to consequential facts—facts upon which the outcome may rely. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Menard v. First Sec. Servs. Corp.*, 848 F.2d 281, 285 (1st Cir.1988). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R.Civ.P. 56(c). An issue is genuine, for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party. *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

Summary judgment is also appropriate when the nonmoving party fails to put forth sufficient evidence to establish an element essential to its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to establish the existence of a fact that is both material, as well as genuine. *Id.* Thus the nonmovant "may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989). In the absence of

such evidence, the moving party will prevail. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54.

## B. Plaintiff's Evidence

■ Before analyzing the various counts below, the Court first addresses a fatal defect which permeates Plaintiff's entire response: a lack of proper evidence and substantiation. Plaintiff's response, and pleadings generally, almost wholly lack citation to necessary evidentiary sources. Dr. Benjamin cites little to no relevant affidavit testimony, other than several references to his own affidavit, no pertinent deposition testimony, or any answers to interrogatories substantiating his claims.[1] Consequently his claims represent no more than bare assertions insufficient to survive summary judgment. *J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir.), *petition for cert. filed,* 65 USLW 3001 (Jun. 19, 1996) (No. 95–2050) ("[N]either 'conclusory allegations, improbable inferences, and unsupported speculation,' nor '[b]rash conjecture' coupled with earnest hope that something concrete will materialize, is [ ] sufficient to block summary judgment.") (internal citations omitted); *Griggs–Ryan v. Smith,* 904 F.2d 112 (1st Cir.1990) ("Neither wishful thinking nor 'mere promise[s] to produce admissible evidence at trial,' nor conclusory responses unsupported by evidence, will serve to defeat a properly focused Rule 56 motion.") (internal citations omitted).

While his twenty-one page Response to Defendants' Motion for Summary Judgment contains six references to his accompanying exhibits, these documents are of little evidentiary value, both in substance and form. For example, Dr. Benjamin's first exhibit, his own affidavit, is filled with unsubstantiated and hearsay-type evidence that would be inadmissible at trial, and is thus excluded for the purposes of summary judgment under Fed.R.Civ.P. 56(e). *See Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993). Dr. Benjamin's other exhibits include: references to the

Court's docket sheet aimed at establishing the timeliness of his pleadings, and letters from an insurance carrier informing certain health care providers that Dr. Benjamin is not currently under suspension from Medicare Services, and that prior information to the contrary was inaccurate. While these materials are more likely admissible they nonetheless do not provide evidence relevant to the issues they are presented to support. Dr. Benjamin also includes various documents with his Complaint which are in large part legally irrelevant, including TAMC memoranda from various doctors stating they would no longer allow Dr. Benjamin to attend to their patients, letters of reference in support of Dr. Benjamin, as well as the memorandum announcing the termination of Dr. Benjamin's staff privileges at TAMC.

■ When matched against the substantive elements of his legal claims, Dr. Benjamin's evidence is plainly insufficient to bear out these claims. On this ground alone summary judgment must be granted, for Rule 56(c) of the Federal Rules of Civil Procedure plainly imposes upon the plaintiff the duty to make a "showing sufficient to establish the existence of an element essential to the party's case...." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *see also Darr v. Muratore,* 8 F.3d 854, 859 (1st Cir.1993) ("A nonmovant [ ] bears the burden of placing at least a single material fact into dispute after a moving party offers evidence of the absence of a genuine issue."); *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989) (one who opposes a Rule 56 motion "may not rest upon her laurels (or her pleadings).") Against this background, the Court turns to the more specific defects in Dr. Benjamin's Counts.

## III. Discussion

As noted, Dr. Benjamin proceeds *pro se,* and the Court consequently affords him certain liberties. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Johnson v. Rodriguez,* 943 F.2d 104, 107 (1st Cir.1991), *cert denied,* 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992);

---

1. This is not to say that Dr. Benjamin does not include affidavits with his pleadings. However those affidavits alone do not suffice to establish

the necessary elements of his claims, nor are they legally acceptable in certain cases.

*Ayala Serrano v. Lebron Gonzalez,* 909 F.2d 8, 12 (1st Cir.1990). His complaint, however, tests the bounds of this leniency. It makes sweeping, and unsubstantiated statements in an effort to support several untenable, if not outrageous, legal assertions. Dr. Benjamin, for example, seeks redress under the Constitution's prohibition against Bills of attainder, cruel and unusual punishment, and self-incrimination. He also asserts his rights to: "Freedom of Assembly," a speedy trial, and effective assistance of counsel. The Court need not address these claims as they could not prove noteworthy under any version of the facts presented.

Plaintiff's complaint does, however, allege several theories which merit discussion. The Court reads Plaintiff's complaint to contain claims under the Sherman and Clayton Acts in Counts I, IV and V, claims under 42 U.S.C. §§ 1981 and 1983 in Count II, and a state law claim for "Malicious Abuse of Report" in Count III. Dr. Benjamin incorrectly assumes that Defendants only seek judgment on Counts I, II and III. To the contrary, Defendants attack all claims and specifically challenge all of Plaintiff's "antitrust claims," thus implicating counts IV and V. (Def.Mot.Summ.J., 13–19.)

## A. Counts I; IV, V: Sherman and Clayton Act Claims

In Counts I, IV and V, Dr. Benjamin alleges violation of §§ 1, 2, 14, 15, 24 and 26 of Title 15.[2] Dr. Benjamin's claims fail on all three counts for a variety of reasons, chief among them, as noted, is the lack of substantiation. His claims also suffer from various other legal infirmities. Accordingly, the Court grants Defendants' Motion for Summary Judgment on Counts I, IV and V.[3]

### 1. Count I

In Count I, entitled "Damages for Monopolizing part of Trade, Services or Commerce," Dr. Benjamin alleges that the Defendants violated § 2 of Title 15 by monopolizing, attempting to monopolize and/or conspiring to monopolize the medical practice in the Presque Isle area. Dr. Benjamin's claim under § 14, also listed under Count I, is a claim for tying or exclusive dealing. Dr. Benjamin bases this claim on TAMC's termination of his hospital privileges and the various difficulties he had with TAMC staff, such as the refusal of certain Caucasian staff members to cover his patients.[4] Dr. Benjamin, however, presents insufficient evidence to bear out these claims. For example, of the three references to supporting evidence in his Response Brief, two refer to his own flawed Affidavit, and the third merely documents the fact that TAMC reported Dr. Benjamin's termination to a national data base.[5]

**2.** The key claims at issue come under §§ 1 (restraint of trade), 2 (monopoly), and 14 (tying/exclusive dealing) of Title 15. The other sections merely provide the basis of relief or liability once violations are found. 15 U.S.C. §§ 15 (authorizes suit and sets guideline for damages), 24 (liability of directors and agents of corporation), 26 (provides for injunctive relief).

**3.** Money damages for these claims would most likely be barred under the immunity provision of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11133, as described below in section C. *Patrick v. Burget,* 486 U.S. 94, 105 n. 8, 108 S.Ct. 1658, 1665–66 n. 8, 100 L.Ed.2d 83 (1988). However as the HCQIA does not preclude injunctive relief, the Court reviews the substance of Plaintiff's Count I claims. *Bryan v. James E. Holmes Reg. Med. Ctr.,* 33 F.3d 1318, 1323 n. 4 (11th Cir.1994) (quoting H.R.Rep. No. 903, at 9, reprinted in 1986 U.S.C.C.A.N. at 6391) ("HCQIA does not restrict the rights of physicians who are disciplined to bring private causes of action for injunctive or declaratory relief."), *cert. denied,* — U.S. —, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).

**4.** Specifically Dr. Benjamin claims that TAMC illegally: (1) sought to force his resignation; (2) refused to honor his medical orders; (3) refused to include him on the list of doctors capable of performing EKG readings; (4) "seized his patients;" (5) reassigned his patients; (6) ordered him not to admit new patients; (7) required his patients to seek the services of other physicians in order to gain medical care at TAMC; and (8) stripped him of his medical privileges. (Resp. at 6.)

**5.** Dr. Benjamin does attach several exhibits to his motion responding to the issue of antitrust damages. While not cited in Dr. Benjamin's Summary Judgment Response, the Court reviewed these exhibits nonetheless. These documents include various letters which establish that other doctors at TAMC have refused to share on-

While the elements of each of the Count I claims varies, common to each is the need for economic evidence to establish either the Defendants' monopoly power, or their intent or ability to influence competition. These concepts require a detailed analysis, and while this Court is unaware of a specific quantum of evidence necessary to credibly establish these factors, Dr. Benjamin offers no economic data, expert testimony or other credible economic evidence on these issues. The Court reviews Dr. Benjamin's specific claims below.

### a. Monopoly claim

■ Section 2 of the Sherman Act prohibits the formation of monopolies, attempts to do so, as well as combinations and conspiracies formed for that purpose. 15 U.S.C. § 2; *see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 195 (1st Cir.1996), *petition for cert. filed*, (July 2, 1996) (No. 96–20). To prevail on a claim of monopolization under § 2 of the Sherman Act, a plaintiff must show that the defendant: (1) has monopoly power in the relevant market; and (2) "has engaged in impermissible exclusionary practices with design or effect of protecting or enhancing its monopoly position." *Id.* (quoting Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 6.4a (1994)); *see also Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). The later requirement is often referred to as exclusionary conduct.

■ As Dr. Benjamin fails to adduce sufficient evidence to establish the necessary element of monopoly power his claim must fail. Monopoly power, or market power as it is commonly referred, often turns on the issue of market share, which may depend on evidence of supracompetitive prices, restricted output, or barriers to market entry—technical concepts which require detailed evidence in support. *See Coastal Fuels*, 79 F.3d at 196 (citing *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995)); *see, e.g., Weiss v. York Hosp.*, 745 F.2d 786, 826–27 (3rd Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) (evidence consisting of expert testimony and testimony as to hospital's market share of inpatient hospital services in its medical service area presented to establish monopoly power). Courts have held, for example, that a charge of monopolization will fail if the defendant is not alleged to maintain at least a seventy percent market share—a quantifiable percentage borne out by specific calculations. *See White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir.1974) (defendant must control at least seventy percent of the relevant market to be subject to monopolization claim); *see, e.g., Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 201–02 (3d Cir. 1992) (a plaintiff must show a "significantly larger" market share than 55 percent to establish a prima facie case of monopoly power), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).

■ Even assuming that Dr. Benjamin identified the most narrow of geographic locations and competitors or product type sufficient to adequately define the relevant market, his claim is nonetheless defective due to his failure to provide any evidence of TAMC's control over that market.[6] He pres-

---

call responsibilities with Dr. Benjamin, an affidavit testifying to the alleged well known policy of TAMC to force Dr. Benjamin from the hospital, and other affidavits from former patients asserting that they would not have changed doctors but for the fact that "Blue Select" told them to. These documents do not shed light on either TAMC's monopoly power or market share at issue in the Count I claims.

**6.** The Court concedes a great deal here as Dr. Benjamin's Complaint fails to sufficiently identify the relevant market necessary to the monopoly power inquiry. The relevant market is defined both geographically, and by product. *See Coastal Fuels*, 79 F.3d at 197. In § 2 claims, the plaintiff bears the burden of establishing both, and must do so with specificity. *Id.* at 197 (citing *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1537 (8th Cir.1989)). The relevant market is that geographic area where defendants face competition and consumers can find alternative product sources. *Coastal Fuels*, 79 F.3d at 196 (quoting *Baxley–DeLamar v. American Cemetery Assn.*, 938 F.2d 846, 850 (8th Cir. 1991)).

Dr. Benjamin fails to adequately define either the geographic area or the product of the alleged

ents nothing to indicate TAMC's percentage of the market share in either the internal medicine field, or the health care industry generally. Rather he relies on his bare assertions that TAMC enjoys a "dominant position within the health care services market in the Presque Isle, Maine area," (Compl. at ¶ V), and that it is "the only hospital in the greater [Presque Isle] area" (Resp. at 5), and the "largest" and the "most powerful" employer in Presque Isle, (*id.* at 8). Dr. Benjamin also fails to present evidence on any of the other factors used to measure monopoly power, such as: "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods on services from outside the market, and consumer demand factors." *Weiss*, 745 F.2d at 827, n. 72 (citing L. Sullivan, *Handbook of the Law of Antitrust* § 22 (1977)). He fails to cite facts, figures or any data relevant to the monopoly power inquiry, and consequently his claim must fail. *See, e.g., Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1059 (9th Cir.1982) (monopoly claim denied due to the lack of "expert testimony or other credible evidence to support an inference of market power."); *Juneau Square Corp. v. First Wisconsin Nat. Bank of Milwaukee*, 624 F.2d 798, 813–14 (7th Cir.) (monopoly claim denied due to both speculative nature and lack of evidence as to defendant's market share), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980).

### b. Attempt to Monopolize

 To succeed on his claim of attempted monopolization under § 2, Dr. Benjamin must prove: "(1) that the defendant[s] ha[ve] engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum*

*Sports v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *see also George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 550 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). Dr. Benjamin relies on the same facts as above to establish this claim. Accordingly, this claim must also fail due to Dr. Benjamin's inability to establish either TAMC's monopoly power, or its probability of attaining monopoly power.

### c. Combine or Conspire to Monopolize

 Dr. Benjamin's combination or conspiracy claim revolves around an alleged conspiracy or combination either between the hospital and its staff or among the hospital staff itself, whose supposed aim was to deprive Dr. Benjamin of his staff privileges at TAMC. A conspiracy by nature contemplates concerted action among at least two legally distinct persons or entities. Despite the fact that the doctors individually and TAMC represent legally distinct entities, the doctors in their capacity as staff members, in particular as members of the peer review committee, act on behalf of the hospital. Thus the hospital and its staff, or the staff as a whole, can be considered a single entity for the purposes of peer review and other administrative decisions. A combination of these doctors, or the doctors and the hospital would thus be incapable of actually conspiring with one another. *See Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 703 (4th Cir. 1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). This relationship is best described as one of agency, not conspiracy, in particular because in the present circumstance "there are no strong antitrust concerns that would warrant a departure from traditional concepts of agency since the hospital and medical staff are not

---

relevant market. His pleadings speak of the State of Maine, the City of Presque Isle, and the greater Presque Isle area, rather than of a single detailed geographic area. As to the product at issue, or the group of his competitors, Dr. Benjamin broadly references a wide range of medical services. These generalities fail to clearly define the relevant market. *See, e.g, Coastal Fuels*, 79 F.3d at 197 ("[m]arket definition is crucial [to a

§ 2 claim]. Without a definition of the relevant market, it is impossible to determine market share [and plaintiff's claim must thus fail].") (quoting *Rebel Oil Co.*, 51 F.3d at 1434); *Flegel v. Christian Hosp. Northeast–Northwest*, 4 F.3d 682, 690–91 (8th Cir.1993) (granting summary judgment due to plaintiff's failure to establish relevant market).

competitors." *Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605, 614 (6th Cir.1990), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991).[7]

Several courts have concluded that a hospital cannot conspire with its staff for the purpose of § 1 of the Sherman Act. *Oksanen*, 945 F.2d at 703–05; *Nurse Midwifery*, 918 F.2d at 614; *Weiss*, 745 F.2d at 816–17; *Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96, 118 (3rd Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); *Pudlo v. Adamski*, 789 F.Supp. 247, 251 (N.D.Ill.1992), *aff'd*, 2 F.3d 1153 (7th Cir.1993), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 879, 127 L.Ed.2d 75 (1994).[8] In reaching that conclusion, these courts relied chiefly on the Supreme Court's disposition in *Copperweld Corp. v. Independence Tube Corp.*, which held that a parent corporation was incapable of conspiring with its wholly owned subsidiary for the purposes of § 1 of the Sherman Act. 467 U.S. 752, 777, 104 S.Ct. 2731, 2744–45, 81 L.Ed.2d 628 (1984). In analogizing to the hospital-medical staff relationship or more accurately the hospital-peer review committee relationship, the Fourth Circuit, for example, adopted a functional approach, looking to the practical authority of the hospital peer review committee in dealing with the physician in question. *Oksanen*, 945 F.2d at 703; *see also Pudlo*, 789 F.Supp. at 251. The court concluded that the hospital, like a corporation, had effectively delegated decisionmaking authority to its staff for the purposes of peer review. *Id.* Specifically, the *Oksanen* court held that: "[i]n effect, the medical staff was work-

ing as the Board's agent under an internal agreement to implement a single, unitary firm's policies of evaluating the conduct and competence of those to whom the hospital extended privileges." 945 F.2d at 703 (quoting *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740–41) (internal quotations omitted).

While the First Circuit has yet to adopt such reasoning with regard to hospitals and their medical staffs, it has interpreted the Supreme Court's decision in *Copperweld* to require the unity of interest analysis adopted by these courts. *Sullivan v. National Football League*, 34 F.3d 1091, 1099 (1st Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). The Court also finds this § 1 conspiracy analysis applicable to the present § 2 claim. For these reasons, and for the other grounds cited above the Court grants Defendants' Motion for Summary Judgment on Plaintiff's Count I conspiracy/combination claim.

### d. Tying/Exclusive dealing agreement

■■■■■ Dr. Benjamin also alleges a violation of § 14 of Title 15 which governs tying arrangements and exclusive dealing agreements.[9] Generally "[a] tying arrangement is an agreement by a party to sell one product only on the condition that the buyer also purchase a different or 'tied' product." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). While the Court remains uncertain as to the exact nature of Dr. Benjamin's § 14 claim, it is nonetheless clear that he has not established that TAMC's actions either "sub-

---

7. In *Oksanen*, the Fourth Circuit highlighted the benefits of encouraging hospitals to delegate various responsibilities to staff committees. 945 F.2d at 704. In the case of peer reviews, the court noted: "[o]ne presumed benefit of authorizing the medical staff to conduct the initial peer review is that it allows physicians with expertise in medical care to make an initial evaluation of whether other physicians have achieved a certain level of professional competence." *Id.*

8. The Ninth and Eleventh Circuits, however, have held that a hospital and its medical staff constitute legally distinct entities capable of conspiring with one another. *See Bolt v. Halifax Hospital Medical Center*, 851 F.2d 1273, 1280 (11th Cir.1988), *vacated and superseded on other grounds*, 891 F.2d 810 (11th Cir.), *cert. denied*,

495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990); *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440, 1449–50 (9th Cir.1988).

9. The statute provides in pertinent part:

[I]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, ... for use, consumption, or resale ..., on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

stantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14; *see Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 684 (10th Cir.1984), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984). As with his monopoly claims above, Dr. Benjamin fails to provide any economic data to establish the impact of TAMC's actions on competition. Accordingly, the Court grants Defendants' Motion on this claim.

### 2. Count IV and V

Dr. Benjamin alleges violations of §§ 1 and 2 of Title 15 in Count IV, and §§ 1, 2 and 24 (provision for liability of directors and agents of corporation) in Count V. Count IV entitled, "Peer Review as Restraint of Trade and Attempted Monopolization of Practice," alleges that members of the internal medicine staff at TAMC conspired to monopolize this trade. While Dr. Benjamin more clearly defines the relevant market, Aroostook County, and product, internal medicine, he still fails to provide competent evidence to bear out the issue of monopoly power under § 2. This claim thus fails.

To prevail on his § 1 claim, Dr. Benjamin must establish: (1) a contract, combination or conspiracy; (2) restraint of trade; and (3) an effect on interstate commerce. *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 (3rd Cir.1991). Dr. Benjamin substantiates this claim with memoranda from various doctors documenting their refusal to cover his patients. Additionally he provides the affidavit of Nurse Teresa Case, who testified that "it was common knowledge among nurses at TAMC that there was a move to drive [Dr.] James Benjamin away from the Hospital." (Case Aff., 1.) Dr. Benjamin's claim nonetheless fails because while doctors may be capable of conspiring as independent actors, they cannot form a conspiracy in their capacity as members of a hospital peer review committee, as discussed above. *Oksanen,* 945 F.2d at 706. Accordingly, Dr. Benjamin's § 1 claim fails.

Under Count V, entitled "Restraint of Trade," Dr. Benjamin alleges that TAMC restrained trade by: (1) failing to disclose necessary records to complete his application to the Carey Medical Center; and (2) by prematurely disclosing information to the Maine State Board of Licensure in Medicine, which in turn transmitted this material to its sister agency in Michigan, preventing Dr. Benjamin's practice in Michigan as well as in Maine. The Court questions whether these facts could ever form the basis of a Sherman Act claim. However, the Court need not delve into this question as Plaintiff's evidence is again insufficient to prevail on either claim. Specifically Dr. Benjamin's proof is insufficient as to: (1) the necessary element of monopoly power needed to prevail under his § 2 claim, and (2) the requisite conspiracy evidence necessary to prevail under § 1.

### B. Count II: Racial Discrimination Claim

Dr. Benjamin's Count II claim, entitled "Denial of Hospital Privileges," alleges racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983. In short, Dr. Benjamin claims that TAMC denied him his due hospital privileges, and discriminated against him generally on the basis of his African–American heritage. For the reasons that follow the Court grants Defendants' Motion for Summary Judgment on both Count II claims.

### 1. § 1983

Dr. Benjamin claims that TAMC violated § 1983 by infringing upon his constitutional rights to equal protection under the Fifth and Fourteenth Amendments. To state a claim under § 1983 Dr. Benjamin must show: (1) the existence of a federal or statutory right, and (2) a deprivation of that right by a person acting under color of state law. *Barrios–Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico,* 84 F.3d 487, 491 (1st Cir.1996); *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 32 (1st Cir.1996). Under the second prong requirement the entity in question must be a state actor. *See, e.g., Johnson,* 943 F.2d at 107 ("Section 1983, after all, applies only to improper action under color of state law—and is, therefore, an irrelevancy in the case of [ ] a private institution."). As Dr. Benjamin invokes federal rights, at issue

is whether TAMC constitutes a state actor for the purposes of § 1983.[10]

Dr. Benjamin characterizes TAMC as a state actor on the grounds that its peer reviews were required by state law. TAMC is a private, non-profit hospital, which conducts peer reviews consistent with internal guidelines and state and federal law. However neither compliance with, nor enforcement of state or federal statutes alone qualifies a private hospital as a state actor. Courts employ a variety of tests in determining whether private entities engage in state action for the purposes of § 1983. The First Circuit recently divided its state actor analysis categorically, looking first to the possibility of direct state action and then to any incidents of indirect state action. *Barrios–Velazquez,* 84 F.3d at 491.

The Court performs this analysis below and concludes that TAMC does not act under color of law, either directly or indirectly. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count II.

### a. Direct State Action

Under the direct state action test courts inquire into whether the entity at issue is either a state agency or whether it mimics a state agency, conceding that "technical labels are not dispositive." *Id.* at 492 (citing *Lebron v. National R.R. Passenger Corp.,* —— U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)). The First Circuit, relying on the Supreme Court's disposition in *Lebron v. National R.R. Passenger Corp.,* —— U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902, held that the controlling factor in the direct state action inquiry was the "degree of control the federal [or state] government had over [the entity in question]." *Barrios–Velazquez,* 84 F.3d at 492; *see also Lebron,* —— U.S. at —— – ——, 115 S.Ct. at 974–75 (Supreme Court held that Amtrak was a state actor because, among other factors, the federal government appointed members to its board, owned voting stock and subsidized perennial losses). In the case at bar Dr. Benjamin provides no evidence to establish that TAMC is controlled or even influenced by officials working for either the State of Maine or the federal government. Consequently TAMC does not qualify as a state actor under this test.

### b. Indirect State Action

The First Circuit employs three distinct tests to determine whether an entity's actions rise to the level of state action under the indirect state action test: (1) the nexus test, (2) the traditional public function analysis, and (3) the symbiotic relationship test. *Barrios–Velazquez,* 84 F.3d at 492–93; *Rodriguez–Garcia v. Davila,* 904 F.2d 90, 96 (1st Cir.1990). Satisfaction of any one of these tests compels a finding that the entity in question qualifies as a state actor. The Court examines each test below concluding that TAMC does not qualify as a state actor under any of the three articulated tests.

### i. Nexus Test

Under the nexus test, the Court must determine whether the state exerted such extensive coercion or encouragement that TAMC's action, here its peer review of Dr. Benjamin, can be considered the conduct of the state itself. *Barrios–Velazquez,* 84 F.3d at 493; *Rodriguez–Garcia,* 904 F.2d at 97. Dr. Benjamin relies on state and federal regulation to establish the "nexus" between the government and TAMC. Courts have, however, consistently held that neither government financing nor regulation, either alone or together, necessarily suffice to convert private action into state action. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982) (extensive regulation did not convert nursing home into a state actor); *Rendell–Baker v. Kohn,* 457 U.S. 830, 840–41, 102 S.Ct. 2764, 2770–71, 73 L.Ed.2d 418 (1982) (extensive government funding and regula-

**10.** The Court notes in passing that several courts have found private hospitals to be private entities and not state actors. *See, e.g., Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 260–61 (1st Cir.1994); *Harvey v. Harvey,* 949 F.2d 1127, 1132 (11th Cir.1992); *Mendez v. Belton,* 739 F.2d 15, 18 (1st Cir.1984); *Modaber v. Culpeper Memorial Hosp., Inc.,* 674 F.2d 1023, 1027 (4th Cir.1982). However as the "state action inquiry" is fact-driven, the Court begins anew. *Barrios–Velazquez,* 84 F.3d at 491.

tion did not convert private school into a state actor); *Rockwell*, 26 F.3d at 258 ("government regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill–Burton funds, are insufficient to establish that a hospital or other entity acted under color of state law"); *Mendez*, 739 F.2d at 18 (same). Thus neither the existence of state or federal statutes authorizing peer reviews, nor the receipt of government funding suffice to qualify TAMC as a state actor.

### ii. Traditional Public Function Test

 Under the traditional public function test, an entity qualifies as a state actor if it has "assumed powers 'traditionally exclusively reserved to the State.'" *Barrios–Velazquez*, 84 F.3d at 493–94 (quoting *Rodriques v. Furtado*, 950 F.2d 805, 813 (1st Cir.1991)). Under this test, the government cannot escape its responsibilities in areas it traditionally performs by simply transferring those duties to a private entity. *Id.* (citing *Rockwell*, 26 F.3d at 258). To qualify as state action the activity at issue thus must be both a traditional government function, as well as an exclusive government function. *Rodriguez–Garcia*, 904 F.2d at 98; *see also Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. at 2772 ("[O]ur holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' We have held that the question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'") (citations omitted).

Dr. Benjamin's claim fails on either prong because courts have yet to classify health care services as either an exclusive or traditional government function. The Supreme Court has held that "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158–59, 98 S.Ct. 1729, 1734–35, 56 L.Ed.2d 185; *see also White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir.

1979) (even the acts of arrest, detention, and search are not considered exclusive government actions); *see, e.g., Blum,* 457 U.S. at 1011–12, 102 S.Ct. at 2789–90 (nursing home care is not a traditional and exclusive government function); *Barrios–Velazquez*, 84 F.3d at 494 (promoting savings, providing loans and administering medical services is not an exclusive government function); *Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1456 (10th Cir.1995) (safeguarding public property is not an exclusive government function); *McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ.*, 24 F.3d 519, 525 (3rd Cir.1994) (evaluation and accreditation of medical facilities is not an exclusive state function); *Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 451 (1st Cir.1983) (civil legal assistance to indigent clients is not a traditionally exclusive public function).[11]

### iii. Symbiotic Relationship Test

 An entity can be considered a state actor under the symbiotic relationship test if it acts as if the government "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity ..." *Barrios–Velazquez*, 84 F.3d at 494 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)). In the case at bar, the government's involvement in TAMC's peer review process is minimal if not nonexistent. Aside from providing legal guidelines, the government plays little to no role in the process. The government has in no way "insinuated" itself into the peer review process at TAMC such that TAMC could be considered to be in a "position of interdependence" with the state. *See Rodriguez–Garcia*, 904 F.2d at 98.

### 2. § 1981

 Section 1981 of Title 42 prohibits purposeful racial discrimination in the formation and enforcement of contracts. *Patter-*

---

**11.** The Supreme Court has held, however, that the management of city parks, *Evans v. Newton*, 382 U.S. 296, 298–302, 86 S.Ct. 486, 487–90, 15 L.Ed.2d 373 (1966), the administration of public elections, *Terry v. Adams*, 345 U.S. 461, 468–70,

73 S.Ct. 809, 812–14, 97 L.Ed. 1152 (1953), and the operation of company owned towns, *Marsh v. Alabama*, 326 U.S. 501, 505–09, 66 S.Ct. 276, 278–80, 90 L.Ed. 265 (1946), do constitute exclusive and traditional government functions.

**972**

*son v. McLean Credit Union,* 491 U.S. 164, 176–77, 109 S.Ct. 2363, 2372–73, 105 L.Ed.2d 132 (1989); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 17 (1st Cir.1989).[12] To that extent the statute's scope remains narrow, and it "cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." *Patterson,* 491 U.S. at 176, 109 S.Ct. at 2372 (1989). Postformation conduct, thus, does not fall within the statute's protections. *Id.* at 176–77, 109 S.Ct. at 2372–73.[13]

■ Consequently only Dr. Benjamin's allegations regarding his contractual relationship with TAMC are legally relevant here. The claims relating to his interaction with various staff members and nurses, for example, are not cognizable under § 1981 because they do not relate to his contract. *Pontarelli v. Stone,* 930 F.2d 104, 114 (1st Cir.1991) ("an action for racial harassment on the job does not lie under 42 U.S.C. § 1981") (citing *Patterson,* 491 U.S. at 179, 109 S.Ct. at 2373–74).

■ A cause of action under § 1981 requires a relevant contract related act, and both purposeful and racially motivated discrimination. *Id.; Stephenson v. State Street Bank & Trust Co.,* 924 F.Supp. 1258, 1279 (D.Mass.1996). "If any of these elements is missing, a section 1981 claim cannot flower." *Dartmouth Review,* 889 F.2d at 16. Dr. Benjamin fails to prove the second prong discrimination requirement. While he notes the absence of other African–Americans on the TAMC staff, and speaks to mistreatment by nurses and TAMC staff, and even presents an affidavit attesting to the alleged policy to force him from the hospital staff, these allegations all relate to postformation conduct. They are thus not legally relevant in § 1981 analysis. *See, e.g., Butler v. RMS Technologies, Inc.,* 741 F.Supp. 1008, 1010 (D.Mass.1990) (claims relating to postformation conduct not cognizable under § 1981). Dr. Benjamin provides no evidence of racial discrimination as to the formation of his contract, or its enforcement through the legal process. The Court therefore grants Defendants' Motion for Summary Judgment on this claim.

12. Section 1981 of Title 42 reads:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 extends to both state and private action, and thus reaches TAMC. *Dartmouth Review,* 889 F.2d at 17.

13. In *Patterson v. McLean Credit Union,* the Supreme Court detailed the scope of § 1981, stating:

By its plain terms, the relevant provision in § 1981 protects two rights: 'the same right … to make … contracts' and 'the same right … to … enforce contracts.' The first of these protections extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract rela-

tion has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

The second of these guarantees, 'the same right … to … enforce contracts … as is enjoyed by white citizens," embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race.… It also covers wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract.… The right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights

… § 1981 … covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process.

491 U.S. at 176–80, 109 S.Ct. at 2372–74 (internal citations omitted) (emphasis in original).

## C. Count III: Malicious Abuse of Report

In Count III, Dr. Benjamin asserts a claim for "Malicious Abuse of Report," alleging that TAMC reported information regarding Dr. Benjamin's conduct to various medical boards which it knew to be false. This claim revolves around the TAMC's November, 1993 peer review committee report which evaluated Dr. Benjamin's performance at the hospital. This committee recommended the suspension of Dr. Benjamin's hospital privileges, and his privileges were later terminated entirely. On November 18, 1993 TAMC Chief Executive Officer David Peterson filed a report regarding Dr. Benjamin's suspension to the Maine State Board of Licensure in Medicine. Peterson also forwarded this information to the National Practitioner's Data Bank on January 4, 1994.

Defendants characterize this claim as one for abuse of process. The exact nature of the tort, however, is not of particular importance in this instance as provisions in both the HCQIA, 42 U.S.C. §§ 11101–11152, and the Maine Health Security Act, 24 M.R.S.A. §§ 2501–2512, require hospitals to disclose certain adverse employment decisions. Furthermore both the statutes afford immunity to the officials and hospitals that provide this type of information. 42 U.S.C. § 11111; 24 M.R.S.A. § 2511. TAMC claims immunity under this legislation and because they qualify the Court grants Defendants' Motion for Summary Judgment as to Count III.

### 1. Federal law

#### a. § 11112 requirements

■ Immunity under the HCQIA is a question of law. *Bryan,* 33 F.3d at 1332 (citing H.R.Rep. No. 903, at 12, reprinted in 1986 U.S.C.C.A.N. at 6394); *see also Austin v. McNamara,* 979 F.2d 728, 734 & n. 5 (9th Cir.1992). Under § 11133 of Title 42, health care entities which conduct "professional review actions" must report these reviews to both the Secretary of Health and Human Services and the "appropriate State licensing board" if the review "adversely affects the clinical privileges of a physician for a period of longer than 30 days." The reporting entity, whether an individual, a review body or a hospital, enjoys immunity from damages as

to its disclosure for all suits except civil rights actions. 42 U.S.C. § 11111. Immunity, however, is contingent on the satisfaction of § 11112(a)'s requirements, which provide that a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and;

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id.* at § 11112(a).

■ Most important, the statute presumes that the professional review body has met these requirements, "unless [this] presumption is rebutted by a preponderance of the evidence." *Id.* This presumption alters the typical summary judgment scenario creating an "unusual standard." *Mathews v. Lancaster General Hospital,* 87 F.3d 624, 632–33 (3rd Cir.1996). Thus under the Act the burden lies with Dr. Benjamin to show that TAMC failed to comply with the § 11112 requirements and that it is not consequently entitled to the HCQIA's grant of immunity. *Bryan,* 33 F.3d at 1333. The Court turns to the record "to determine whether [Dr. Benjamin] satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of the HCQIA." *Id.* at 1334; *see also Austin,* 979 F.2d at 734 ("Might a reasonable jury, viewing the facts in the best light [to the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?").

■ Dr. Benjamin's attack could be read to challenge several of the § 11112(a) re-

quirements. First he alleges that the hospital lied, implicating prongs (2) and (4). Additionally Dr. Benjamin asserts that the hospital used this information to maliciously attack him violating § 11112(a)(1)'s aim of furthering "quality health care." [14] Specifically Dr. Benjamin argues that TAMC falsely concluded that he was unavailable for his patients, and that its assertion as to his incompetence is contradicted by the hospital's own performance records. Dr. Benjamin, however, fails to provide competent evidence to either rebut, or even question TAMC's action on the basis of § 11112, and the statute imposes that burden on him. Dr. Benjamin's pleadings on this issue contain only one supporting citation, a reference to a TAMC report entitled, "Summary of Events Concerning Dr. James Benjamin's Summary Suspension," and this evidence neither supports Dr. Benjamin's assertions, nor provides any other evidence which calls into question TAMC's actions.[15] As to the claims relating to his professional competence, Dr. Benjamin provides no supporting evidence to rebut the hospital's conclusions.[16] His unsubstantiated assertions alone are insufficient to create a disputed issue of material fact.[17]

**b. § 11133 immunity**

■ Dr. Benjamin also seeks to invoke the HCQIA's immunity waiver, § 11133(c)(1), which strips the relevant health care entity of the statute's immunity protections if that entity fails to report information required under the statute. 42 U.S.C. § 11133(c)(1). This provision is triggered, however, "only if the Secretary [of Health and Human Services] first publishes the name of the entity in the Federal Register pursuant to [the] provisions of section 11111(b) of the Act." *Johnson v. Greater Southeast Community Hosp. Corp.*, 1996 WL 377147, *9 (D.D.C.).

■ Dr. Benjamin asserts that TAMC failed to report several of his supposed improprieties, such as his alleged "incompetence/malpractice/negligence," "substandard clinical performance," and "disruptive behavior." (Resp. at 12–13). Dr. Benjamin, however, neither argues, nor presents any evidence that the Secretary has ever listed TAMC among the list of delinquent health care entities as required under the statute. 42 U.S.C. § 11111(b). Nor does Dr. Benjamin suggest that the Secretary has ever taken any of the due process measures re-

---

14. Dr. Benjamin does not contest that the TAMC review committee constitutes a "professional review body," or that his suspension and later termination qualify as a "professional review action." *See, e.g., Bryan,* 33 F.3d at 1334 (board of directors revoking doctor's staff privileges constitutes "professional review body" taking "professional review action" under the HCQIA.) The HCQIA defines a "professional review body" as: a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity. 42 U.S.C. § 11151(11). A "professional review action" is defined as:

[A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician.

*Id.* § 11151(9).

TAMC also qualifies as a "health care entity" given it constitutes "a hospital that is licensed to

provide health care services by the State in which it is located." *Id.* § 11151(4)(A)(i).

15. Dr. Benjamin cites this report to rebut TAMC's charge that he was unavailable for his patients in early November, 1993. He quotes a reference in the report made by Dr. Jones, that states that Dr. Benjamin "was on the floors writing orders on patients ..." to support his claim that he was in fact present at the hospital during the disputed time period. (Resp. at 10.) Dr. Jones' comment, however, refers to November 12, a day not within the challenged period.

16. Dr. Benjamin makes references to various peer reviews characterizing his performance as "appropriate" but does not provide supporting documentation of this fact. He also provides several letters of reference attesting to his professional competence, however, these letters do not comment specifically on his work at TAMC.

17. As the Court grants summary judgment on Count III for a lack of credible evidence, the Court need not address Defendants' assertions relating to the prior state court proceeding involving these parties, and any collateral estoppel effect they may have on the present action.

quired by the HCQIA before the Secretary can list the entity in the Federal Register. *Id.* (HCQIA requires "notice of noncompliance, an opportunity to correct the noncompliance, and an opportunity for a hearing."). Thus the Court need not address the question of whether or not TAMC has waived its immunity, as there is no evidence that they would be in a position to do so. *See, e.g., Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994) (§ 11111(b) immunity waiver not triggered because plaintiff failed to provide evidence that Secretary ever investigated, charged or cited hospital for violating § 11133's reporting requirements); *Greater Southeast Community Hosp. Corp.,* 1996 WL 377147 at \*9 (same).

**2. State law**

 Defendants enjoy immunity from suit under Maine law, which affords physicians and professional competence committees, among others, "acting without malice," immunity from civil liability for "any report or other information [made] available to any board, appropriate authority, professional competence committee or professional committee pursuant to law." 24 M.R.S.A. § 2511. The Supreme Judicial Court of Maine has defined malice as either "actual malice, *i.e.,* ill will, or implied malice, *i.e.,* reckless disregard for the truth or falsity of the slanderous element of a statement." *Onat v. Penobscot Bay Medical Center,* 574 A.2d 872, 874 (Me.1990) (internal citations omitted). As Dr. Benjamin provides no significant evidence of malice, Defendants may avail themselves of the § 2511 grant of immunity. This immunity, unlike the federal immunity, shields the Defendants not just from money damages but from suit entirely. Accordingly, the Court grants Defendants' Motion for Summary Judgment on Count III.

**IV. Attorney's Fees**

 Finally, Defendants move for attorney's fees pursuant to 42 U.S.C. § 11113. The HCQIA allows for attorneys' fees if either the plaintiff's claim or actions were "frivolous, unreasonable, without foundation, or in bad faith." Attorney's fees under

§ 11113 are a discretionary matter for the district court to determine. *Addis v. Holy Cross Health System Corporation,* 88 F.3d 482, 486–87 (7th Cir.1996); *Johnson v. Nyack Hosp.,* 964 F.2d 116, 123 (2d Cir. 1992). They are not mandatory. *Lancaster General Hospital,* 87 F.3d at 641–42. While Dr. Benjamin's conduct may appear unreasonable in light of his previous state court suits regarding these matters, his claims are not wholly without merit. The Court does not find that Dr. Benjamin's conduct merits an award of attorneys' fees to the Defendants. Accordingly, the Court denies Defendants' Motion for attorneys' fees.

**V. Conclusion**

For the reasons stated above the Court

(1) *GRANTS* Defendants' Motion for Summary Judgment on all Counts;

and

(2) *DENIES* Defendants' request for attorneys' fees.

*It is so ORDERED.*